[No. F050101. Fifth Dist. July 27, 2007.]

THE PEOPLE, Plaintiff and Respondent, v.
LARRY DIXON, JR., Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION*]**

---

*Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts III., V., and VI.

**COUNSEL**

Joan Isserlis, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, Mary Jo Graves, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Louis M. Vasquez, Brian Alvarez and William K. Kim, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**WISEMAN, Acting P. J.**—On an appeal from a judgment of conviction following a court trial, we conclude in the published portion of our opinion that the trial court did not improperly induce appellant's waiver of his right to a jury trial with a promised benefit. In addition, we decide the trial court did not err in excluding as unreliable a hearsay declaration by the codefendant purporting to exonerate appellant. In the unpublished portion of our opinion, we determine there is sufficient evidence to support the verdicts, that appellant received adequate notice of the personal-use-of-a-deadly-weapon enhancement found true by the trial court, and that the trial court did not abuse its discretion in denying appellant's motion for new trial. Finally, we order that a clerical error appearing in the abstract be corrected.

## *PROCEDURAL HISTORY*

Appellant Larry Dixon, Jr., was found guilty after a court trial of four counts of second degree robbery (Pen. Code,[1] § 211). He was found not guilty of being an ex-felon in possession of a firearm. The court also concluded that Dixon had personally used a deadly weapon (a pellet or BB gun), a violation of section 12022, subdivision (b), and a lesser included offense of the enhancement actually charged (personal use of a firearm, § 12022.53, subd. (b)). Finally, the court found that Dixon has suffered two prior strikes (§§ 667, subds. (c)–(j), 1170.12, subds. (a)–(e)); two prior serious felony convictions (§ 667, subd. (a)(1)); and seven prior prison terms (§ 667.5, subd. (b)).

At sentencing, the court denied Dixon's request that one or more of his prior strikes be struck. (*People v. Superior Court (Romero)* (1996) 13 Cal.4th 497 [53 Cal.Rptr.2d 789, 917 P.2d 628].) Dixon was sentenced to a total term of 121 years to life: an indeterminate sentence of 25 years to life for each of the four counts, plus one year for each of the four personal-use enhancements, plus five years for each of the two prior serious felony convictions, plus one year for each of the seven prior prison term enhancements.

Dixon's codefendant, Michael Wallace, was tried at the same time. He was also found guilty of the robberies and of using a deadly weapon during the course of the robbery. Dixon's motion for new trial was denied.

---

[1] All further references are to the Penal Code unless otherwise indicated.

## *FACTUAL HISTORY*

On August 16, 2002, Dixon and his longtime friend, Wallace, walked into the Bank of the West carrying what appeared to be guns and Burger King bags, and wearing nylons as masks and distinctive hats. (Wallace had on a white or yellow construction hard hat and Dixon a white or light-colored floppy-type hat.) Wallace was wearing a white T-shirt. Dixon had on a long-sleeved, distinctive plaid Pendleton-style shirt—although the witnesses disagreed on the exact color. Wallace approached one of the tellers and demanded that she put all her money into the Burger King bag. Dixon approached a second teller and told her to put her money into the bag. A third teller came to assist because the second did not have access to a money drawer and placed money from her drawer into the bag. The two men then went to a fourth teller and ordered her to put her money into the bag. Each time, one or both of the men exhibited guns. There was evidence that the guns were BB guns or pellet guns and not real firearms. The men then left the bank, taking with them $17,595.49.

The tellers, a bank customer, and two employees of a nearby Burger King testified at trial that Dixon and Wallace generally met the descriptions of the robbers. None of the witnesses could make a positive identification of the men for police, although one teller identified Dixon at trial.

Due to the fact that Wallace suddenly had a lot of money, his mother suspected that he and Dixon were involved in the robberies and called police. She was asked to view the videotapes and still photographs of the bank robbers and positively identified both Wallace and Dixon as the robbers. At trial, she said she could not be sure it was Dixon in the photos, but admitted she had been certain when she made the identification for police. The police then set up a surveillance team to watch Wallace and his apartment. They saw Dixon go to the apartment and leave with Wallace on September 11, the same day they had a tip that the two were planning another robbery. Wallace and Dixon were arrested when they left the apartment together.

Upon searching Wallace's apartment, the police found a white hard hat, clothing consistent with that worn by the robber identified as Wallace, and receipts and other papers dated August 16, 2002, involving the purchase of a car ($2,000) and a television. Wallace's mother testified that there were other unusual purchases made by Wallace shortly after the robbery.

Upon searching Dixon's mother's house, where he lived much of the time, police found a floppy hat that generally fit the description of the one worn in

the robbery and a plaid shirt that matched the exact pattern of the shirt worn in the robbery. (The video photos were in black and white so a color could not be discerned from them.) Upon searching Dixon's girlfriend's apartment, police found $900 in cash and a note indicating the money was from Dixon. They also found a receipt for $4,000 cash dated August 24, 2002, for the purchase of a vehicle by Dixon. Dixon's girlfriend told police the $900 came from Dixon. At trial, she said $600 belonged to her and she loaned Dixon $1,500 to buy the car. Dixon's girlfriend viewed the still photos from the robbery and told police the man in the photo appeared to be Dixon.

Wallace told police the money he used to buy his car came from his mother; however, she denied giving the money to her son. Dixon said he got the $4,900 from people who owed him money. While the men were incarcerated, Dixon sent his private investigator to obtain a declaration from Wallace. The declaration stated that Wallace was "personally involved in the robbery for which Mr. Dixon is currently charged." The declaration also claimed that Dixon was not involved in the robbery, but had received money from Wallace as a result of "personal business."

None of the money recovered could be traced directly to the robbery. The guns were never found. Both men have a history of drug abuse.

### DISCUSSION

*I. Waiver of jury trial*

Dixon claims that his waiver of the right to trial by jury was induced by the trial court's offer of a benefit, i.e., the waiver would be considered a mitigating factor at sentencing and, therefore, under the federal and state Constitutions, was not voluntarily made. We disagree.

A criminal defendant may waive fundamental rights, including the right to a jury trial. (*People v. Collins* (2001) 26 Cal.4th 297, 305 [109 Cal.Rptr.2d 836, 27 P.3d 726] (*Collins*).) A defendant's waiver of the right to a jury trial, as with other fundamental rights, however, may be accepted by the court only if done in a knowing, intelligent, and voluntary manner. (*Colorado v. Spring* (1987) 479 U.S. 564, 573 [93 L.Ed.2d 954, 107 S.Ct. 851].) Coercion, either in the form of penalizing a defendant for exercising a constitutional right or promising leniency to a defendant for refraining from exercising a right, renders a waiver involuntary. (*Collins, supra*, at pp. 306–309.)

In *Collins*, the trial court gave the necessary advisements before taking the waiver of a jury trial, but also made statements to the defendant prior to taking the advisements that " 'there might well be a benefit in [waiving a jury trial]. Just by having waived jury, that has some effect on the court.' " (*Collins, supra*, 26 Cal.4th at p. 302, italics omitted.) The court indicated it was not specifying any particular benefit but confirmed that there would be " 'some benefit.' " (*Id.* at p. 302.) The California Supreme Court concluded that the trial court's promise of " 'some benefit' " was an improper inducement which rendered the waiver involuntary. (*Id.* at pp. 304, 312.) The court explained: "[T]he objective of the trial court's comments was to obtain defendant's waiver of a fundamental constitutional right that, by itself (when defendant elects to go to trial), is not subject to negotiation by the court. In effect, the trial court offered to reward defendant for refraining from the exercise of a constitutional right. [Citations.] The circumstance that the trial court did not specify the nature of the benefit by making a promise of a particular mitigation in sentence, or other reward, does not negate the coercive effect of the court's assurances. . . . The inducement offered by the trial court to defendant, to persuade him to waive his fundamental right to a jury trial, violated defendant's right to due process of law." (*Collins, supra*, 26 Cal.4th at p. 309, fn. omitted.) Where an improper inducement leads to a waiver of a jury trial, there is structural error requiring reversal. (*Id.* at p. 312.)

Here, on March 24, 2004, prior to the start of trial, the court was advised that counsel for Wallace and Dixon were considering whether to waive jury trial. The decision centered on an evidentiary ruling not yet made by the court—whether the declaration obtained from Wallace would be admissible before a jury. On March 26, the court ruled that, although Wallace's admission would be admissible in a jury trial, the part of the declaration exonerating Dixon would not be. There was extensive discussion about the impact of this ruling. On March 29, defense counsel notified the court that Dixon was prepared to waive his right to a jury trial. Counsel asked for an indicated sentence. The court said, "As you all know, when someone either goes by way of a jury trial or pleads out I do consider the fact that a jury is not going to be used to try the case as a mitigating factor, so I factor that into any sentencing decision I make. How that will play out in this case, I said I don't know." Counsel then asked the court whether a *Romero* motion to strike Dixon's priors would be considered "frivolous." The court responded, "Well, I don't know." It continued, "if we don't have a jury that's something I consider as a mitigating factor. What I will do with the sentencing, I'm not sure. What I can tell you is I will consider that in making a decision." After some further discussion with counsel, the court asked Dixon, "Is that what

you want to do, sir, Mr. Dixon?" Dixon then talked to his attorney off the record. The decision was made *not* to waive jury trial and counsel requested a jury panel.

That same morning, several other evidentiary matters were discussed at length. Wallace asked to address the court. He told the court the evidence was overwhelming against him and he was likely to be convicted. The deputy district attorney explained that the issue preventing resolution of the case was the gun enhancement and that, as his defense attorney had advised, it was in Wallace's best interest to go to trial on that issue. The prosecutor was unwilling to reduce the enhancement charged and would require a straight-up plea to resolve the issue without trial. The deputy district attorney then turned to Dixon and said, "With regard to Mr. Dixon, similarly there is an effort being made by his attorney to do the very best. . . . It was why he was counseled to consider a court trial in this case, not because his attorney's throwing in the towel, but because there is evidence that will be able to come in that can't easily be presented in front of a jury that would, in fact, be precluded in front of a jury."

Wallace continued to ask why he could not simply "deal" with the trial court. Further discussion took place. The deputy district attorney explained in detail to both defendants that if they waived a jury trial, Wallace would be able to explain his involvement and Dixon could explain whether he was there, how he knew Wallace, and how he got the money. He told them the defense attorneys were attempting to put them in the best position possible to try this case and a court trial was the best option. The prosecutor explained, "But you will have a hard time testifying in front of a jury because they will look at your priors if you testify. You'll be impeached with them." The court stated, "Then, Mr. Wallace, what [the district attorney] said is absolutely correct. He broadened it to include Mr. Dixon, but any trial we're going to have is going to be a joint trial unless both sides give up a right to a jury trial . . . . I think the single thing that you're most concerned about is the firearm because the length of the enhancement. If you get rid of that, I guess you would be willing to plead." The court continued, "[Y]ou're really in a very bad way here, Mr. Wallace. . . . [T]here's no way to resolve it, so it's either going to be a jury trial for both of you or a court trial for both of you. I understand your position, sir. It's been made clear from the beginning."

Dixon's counsel then asked for a moment. There was an off-the-record discussion. When proceedings resumed, Dixon's counsel stated: "Your Honor, Mr. Dixon at this time would waive his right to a jury, and if I might just for the record . . . I think Mr. Dixon is doing that because you said it's in his

own best interest[2] and it is—it's been my advice to him that I thought that he would have—that we would have—[been] freer to present his case in front of you than we would in front of a jury. I think that I—I think that I've stopped that—that line to where I have not turned any persuasive powers that I would have against my client's wishes. I think that he's making his decision based on the advice I've given him and that I have—and that I've not engaged in any arm twisting. Mr. Dixon is pretty adamant about his opinions and he's managed to stick to those. At this time he's advised me that he is ready to waive jury trial."

The court asked if this was correct, and Dixon said yes. In addition to the routine advisements, the court said "I know you've had a lot of time to think about it. There was some discussion about this since last week, and I can't advise you as to what might be in your best interest, sir, only your attorney can and you've had those discussions. Obviously, you heard the comments made by the district attorney and by [Wallace's defense counsel], [and] Mr. Wallace's statements, so this has to be your own decision, sir." The deputy district attorney then waived the prosecution's right to a jury trial and said: "There were certain advantages that the prosecution has stated would be available to the defendants in the event of this waiver, and while I don't believe that to have been intended as a quid pro quo I do intend to make that evidence available. [¶] I believe that we had specifically stated that the witness statements, their opinions, particularly as to the nature of the weapon that Mr. Wallace possessed would be admissible without objection by the prosecution and we would stand by that, [¶] . . . [¶] . . . the entirety of Michael Wallace's declaration because the court had to see that, hear that. We would agree that the court may consider that in its entirety. That would be to the benefit of Mr. Dixon in particular."

■     We agree that the initial comments by the court (that it would consider a waiver of the right to a jury trial a mitigating factor at sentencing) were an improper promise of a benefit for waiving a fundamental constitutional right. If the court had taken Dixon's waiver at this point, it would have been involuntary and required reversal. However, we do not believe that, under these facts, the improper promise actually induced Dixon's waiver. After the discussion in which the court made its improper promise, Dixon decided against waiving his right to a jury trial—*Dixon asked that a panel be sent up*. It was only after Wallace expressed his frustration about having to go to trial, and the lengthy discussion that ensued about various evidentiary issues, that Dixon decided without improper inducement that he wanted to waive his right to a jury trial.

---

[2] Given the context, we believe the reference here is to the trial court's statement that the prosecutor was correct when he said there were evidentiary benefits to having a court trial.

We are persuaded that this is the correct result for a number of reasons. First, the deputy district attorney explained in detail how a court trial would benefit Dixon, and there was no mention of any sentencing considerations. Second, defense counsel explained that the prosecutor's statements mirrored his own advice to Dixon. Third, the reasons given by counsel and confirmed by Dixon are that Dixon wanted to waive his right to a jury trial because he felt freer to present his case to a judge rather than to a jury. (See *McMahon v. Hodges* (2d Cir. 2004) 382 F.3d 284, 290–291 [U.S. Supreme Ct. has never held that choice to waive fundamental constitutional right must be " 'unfettered' "; waiver must be knowing and voluntary but no more].) Fourth, counsel's reasoning is supported by the record and the law. Fifth, the trial court never again mentioned the effect of any waiver on sentencing. Finally, Dixon does not claim in his motion for new trial that he agreed to waive a jury trial because he had been promised a benefit at sentencing that did not occur—he challenged the waiver on other grounds.

In light of *Collins,* we do not apply a prejudice analysis here. *Collins* held that, where a plea has been obtained by an offer to reward a defendant for refraining from the exercise of a constitutional right, the waiver is not voluntary and the error is structural, requiring reversal. (*Collins, supra,* 26 Cal.4th at p. 311.) It rejected using a prejudice analysis. (*Ibid.*) As an intermediate appellate court, we are bound by *Collins.* (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455 [20 Cal.Rptr. 321, 369 P.2d 937].) Here, however, this case compels a factual conclusion that the court's earlier improper promise to treat the waiver as a mitigating factor at sentencing was rejected by Dixon and did not induce Dixon's subsequent waiver of his right to a jury trial. Unlike *Collins,* Dixon's waiver and the improper promise are sufficiently separate in time to allow us to conclude with confidence that the improper promise did not induce the waiver. Dixon rejected the initial advice of counsel that he be tried in front of the court rather than a jury. It was only much later in the hearing, after assertions were made by Wallace and the prosecutor on unrelated matters, that Dixon decided he wished to waive his right to a jury trial. As a result, there is no structural error requiring per se reversal. (See *Arizona v. Fulminante* (1991) 499 U.S. 279, 310 [113 L.Ed.2d 302, 111 S.Ct. 1246] [structural error is constitutional deprivation affecting framework within which trial proceeds, not simply error in trial process itself]; *Rose v. Clark* (1986) 478 U.S. 570, 577–578 [92 L.Ed.2d 460, 106 S.Ct. 3101] [structural error undermines ability of criminal trial to reliably determine guilt or innocence and is fundamentally unfair].)

Since we do not conclude that the waiver was induced by a promise, we need not address Dixon's contention that the trial court breached its promise

to treat the waiver as a mitigating factor at sentencing. We also need not address Dixon's contention at oral argument that there was "another violation of due process" when the trial court offered a sentence of 35 years in prison instead of 121 years to life in exchange for Dixon's waiving his appellate rights. Page 20 of the opening brief in a section labeled "The Procedural Facts," a subsection of the first argument section in Dixon's opening brief titled "THE JUDGMENT MUST BE REVERSED BECAUSE THE COURT, IN FLAGRANT VIOLATION OF DUE PROCESS, INDUCED [DIXON] TO WAIVE HIS RIGHT TO A JURY TRIAL AND THEN BROKE THE PROMISE IT MADE TO INDUCE THE WAIVER," includes the representation that the trial court offered Dixon a term of 35 years instead of sentencing him as a three-strike defendant conditioned on Dixon's waiver of appeal rights.[3] Despite this mention, nowhere in the opening brief does Dixon frame this as an appellate issue. Dixon offers no argument or authority to support a claim of error on the ground that the court's offer to impose a 35-year sentence only upon a waiver of appellate rights was a separate violation of due process. In a section entitled "The Trial Court Reneged On Its Promise After It Obtained The Waiver of A Jury Trial From Dixon," Dixon argues that the court's offer to give Dixon a sentence of 35 years, even though it believed the proper sentence was 121 years to life, could not be considered as proof that the court kept its promise (to consider the waiver of a jury trial as a mitigating factor) because the offer was improperly based on a waiver of appellate rights. In a footnote, Dixon says it was improper to try to extract a waiver of appellate rights in return for the 35-year sentence and claims the only way to insulate the proposed 35-year sentence from reversal was to seek a waiver of the People's right to appeal. The footnote does not present a cognizable legal argument that due process rights were violated or that the error requires reversal under applicable standards, and cites no authority to support this argument.

In his reply brief, Dixon changes tack. In noting that respondent failed to address certain contentions, Dixon characterizes his arguments as (1) that the trial court reneged on its promise at sentencing to mitigate his sentence and in doing so violated due process, and (2) that the judge committed judicial misconduct in conditioning the offer of 35 years on a waiver of appellate rights. Respondent's failure to respond to these arguments is not surprising given Dixon's failure to raise them in his opening brief. Dixon also states in his reply brief that we should not conclude that the trial court's "attempt to

---

[3] What the court actually said was that, because of the length and extent of Dixon's prior record, sentencing Dixon as anything other than a third-strike defendant would very likely be reversed on appeal because "[t]he only sentence that [a] judge rationally will give is to sentence you under the three strikes law." "There is no basis for [striking the priors]." The court said it was nonetheless willing to strike the priors and sentence Dixon to 35 years, "so long as I know he's not going to appeal it."

bargain was harmless beyond a reasonable doubt" because Dixon declined the proffered inducement (the 35-year term) and preserved his right to appeal. Dixon claims we should not condone the court's attempt to secure a waiver of Dixon's right to appeal; however, he offers no authority to support this position. Further, he does not provide a legal argument to support his claim of error. We cannot tell whether this is an argument alleging judicial misconduct, an allegation of constitutional due process error, or an argument piggybacked to Dixon's claim that he was prejudiced by the court's alleged failure to fulfill the promise that induced waiver of jury trial. If it is the latter, we need not address it because we have concluded that there was no inducement to waive jury trial.

We conclude that Dixon has waived the issue of whether the court's offer to impose 35 years if Dixon waived appeal rights violated due process or constitutes judicial misconduct. Neither issue was properly presented on appeal nor supported by authority. We cannot consider Dixon's contentions in the abstract. (*Guthrey v. State of California* (1998) 63 Cal.App.4th 1108, 1115 [75 Cal.Rptr.2d 27] [appellate court may consider contentions waived if not supported by sufficient argument or authority]; see also *People v. Jones* (1998) 17 Cal.4th 279, 304 [70 Cal.Rptr.2d 793, 949 P.2d 890] [defendant who presents claim perfunctorily and without supporting argument invites rejection in similar fashion].) It is also improper to raise issues for the first time in a reply brief or at oral argument.[4] (*Sunseri v. Camperos Del Valle Stables, Inc.* (1986) 185 Cal.App.3d 559, 562, fn. 4 [230 Cal.Rptr. 23].) The bottom line is that Dixon obviously did not waive his appeal rights and has not claimed that he would have accepted the 35-year offer had it been unconditionally made.

## II. Hearsay declaration

Dixon further contends that the court erred when it ruled that Wallace's statement exonerating Dixon would not be admissible in front of a jury. After Dixon and Wallace were arrested and while they were both in custody at the Fresno County jail, Dixon asked his private investigator, Jeff Johnson, to check with Wallace about a declaration Wallace was going to sign. Wallace then called Johnson several times, telling him that he should come down to the jail because Wallace was ready to sign the declaration. The declaration states: "Mr. Larry Dixon had nothing to do with the robbery of the Bank of the West. I know this because I was personally involved in the robbery for which Mr. Dixon is currently charged. I subsequently conducted personal

---

[4] The only authority ever presented in support of these contentions was cited at oral argument, *North Carolina v. Pearce* (1969) 395 U.S. 711 [23 L.Ed.2d 656, 89 S.Ct. 2072], which holds that a defendant cannot be punished after successfully exercising appellate rights and was expressly limited in *Alabama v. Smith* (1989) 490 U.S. 794 [104 L.Ed.2d 865, 109 S.Ct. 2201].

business with Mr. Dixon in which he ended up with money I stole from the bank, unbeknownst to Mr. Dixon. Mr. Dixon knew nothing of my involvement in the bank robbery and did not know the money was stolen."

Dixon first argues that this statement, exonerating him from involvement in the robbery, was admissible as an exception to the hearsay rule (Evid. Code, § 1200) because it was a statement made against a pecuniary or proprietary interest (Evid. Code, § 1230). We review claims of evidentiary error under an abuse of discretion standard. (*People v. Cooper* (2007) 148 Cal.App.4th 731, 740 [56 Cal.Rptr.3d 6].)

■ According to Dixon, by excluding Dixon as a codefendant, Wallace was exposing himself to an increased risk of civil liability. With $17,595.49 at stake, Wallace's statement was contrary to his pecuniary interest, and "a reasonable man in his position would not have made the statement unless he believed it to be true." (Evid. Code, § 1230.) This argument fails because it was never raised in the trial court and is waived on appeal. "[A]n appellate court will not consider claims of error that could have been—but were not—raised in the trial court. [Citation.]" (*People v. Vera* (1997) 15 Cal.4th 269, 275 [62 Cal.Rptr.2d 754, 934 P.2d 1279].) Next, Dixon argues that the statement was admissible because it was against Wallace's penal interest. This argument was raised, but we do not see how it assists Dixon. The trial court found that parts of the statement were admissible as statements against Wallace's penal interest and ruled they were admissible. It ordered those portions that were not against Wallace's penal interest, i.e., those related to Dixon, to be redacted. A court may redact portions of the statement not "disserving to the interests of the declarant." (*People v. Leach* (1975) 15 Cal.3d 419, 441 [124 Cal.Rptr. 752, 541 P.2d 296]; see also *People v. Duarte* (2000) 24 Cal.4th 603, 612 [101 Cal.Rptr.2d 701, 12 P.3d 1110] [court must redact portions of statement not falling within hearsay exception].) In his reply brief, Dixon argues that, because those portions ordered redacted were statements against Wallace's pecuniary interests, once the court found other parts of the statement were against Wallace's penal interest, the entire statement should have been admitted. This is nothing more than an attempt to piggyback the argument waived into this one. The only evidentiary claim made at trial was that the statement was against Wallace's penal interest. The trial court found this was a valid reason for admission and ruled the statement would be redacted.

Last, Dixon argues that the entire declaration should have been admitted under federal constitutional authority. He claims that, given the rule set down in *Chambers v. Mississippi* (1973) 410 U.S. 284 [35 L.Ed.2d 297, 93 S.Ct. 1038], statements made under circumstances that provide assurance of their reliability and that are critical to the defense cannot be excluded on hearsay

grounds. Doing so, he contends, would run afoul of the Fourteenth Amendment's guarantee of due process. Dixon also cites to *Green v. Georgia* (1979) 442 U.S. 95, 97 [60 L.Ed.2d 738, 99 S.Ct. 2150] (judge excluded on hearsay grounds testimony that coperpetrator shot victim after sending Green away on errand) and *Chia v. Cambra* (9th Cir. 2004) 360 F.3d 997 (coperpetrator told law enforcement that Chia not involved in murders; statement wrongfully excluded on hearsay grounds).

In *Chambers*, the defendant was tried and convicted of the murder of a policeman. Shortly after the crime, a third party confessed to several friends on separate occasions that he killed the officer. He later made a sworn confession to the crime. The defense centered on showing that the third party had killed the police officer. (*Chambers v. Mississippi, supra*, 410 U.S. at p. 289.) The trial court refused to allow Chambers to treat the third party as an adverse witness once the sworn confession was repudiated on the stand because Mississippi law prohibits impeaching one's own witness. (*Id.* at pp. 291, 295.) The court also rejected on hearsay grounds Chambers's attempt to introduce the testimony of three witnesses to whom the third party had admitted shooting the officer. (*Id.* at pp. 292–293.) Mississippi recognized as an exception to the hearsay rule statements against pecuniary interest, but not statements against penal interest. (*Id.* at p. 299.) Observing that Chambers's defense was "far less persuasive" than it might have been had he been allowed to admit testimony from other sources about the confession, the Supreme Court stated that the hearsay statements came with "considerable assurance of their reliability" because the confession was given spontaneously to friends shortly after the crime, and the statements were corroborated through other evidence. (*Id.* at pp. 294, 300.) Given these circumstances, the Supreme Court concluded that Chambers had been deprived of a fair trial. (*Id.* at p. 302.)

In *Green*, the Supreme Court again determined that the exclusion of hearsay evidence under circumstances similar to those in *Chambers* violated the defendant's right to a fair trial. Two codefendants abducted the victim and, acting either in concert or separately, raped and murdered her. The first defendant, Moore, was convicted in a separate trial. In his trial, Green attempted to introduce evidence that Moore had confessed to a close friend that he had killed the victim after sending Green on an errand. The victim had been shot more than once with the same gun. In the absence of any direct evidence, the prosecution argued that the jury could infer from the multiple gunshot wounds that both Green and Moore were the shooters. (*Green v. Georgia, supra*, 442 U.S. at p. 96.) The Supreme Court concluded that the statement was reliable and ruled it should have been admitted. The court observed that Moore made his statement spontaneously to a close friend. The evidence corroborating the confession was ample and sufficient to procure a conviction of Moore and a capital sentence. Further, the statement was

against Moore's penal interest, and there was no reason to believe that Moore had any ulterior motive in making it. Under these circumstances, the court held that the evidence should have been admitted. (*Id.* at p. 97.)

In *Chia*, three undercover drug enforcement agents were shot and two died in a drug sting. During the melee that followed the shootings, two of the shooters were killed and the third, Wang, was seriously wounded. A fourth man, Chia, was present but not directly involved in the shooting. Wang made five separate statements to police—the first while Wang was awaiting surgery at a point when he did not know whether he would survive. Each time, Wang said that Chia was not involved in the drug deal or the murders. Wang indicated that Chia knew about the plan to rob the agents during the deal and had warned Wang not to participate. Chia was present at the shooting only because he had come along to protect Wang from the other gunmen. Wang's statements were consistent with what the agents had observed during their surveillance of the four men's activities prior to the murders. At Chia's trial, Wang refused to testify and the trial court ruled that his exculpatory hearsay statements were not admissible. Chia was convicted. (*Chia v. Cambra, supra,* 360 F.3d at pp. 999–1002.)

The primary issue at trial was Chia's motive and the nature of his actions the day the Drug Enforcement Agency agents were murdered. His close proximity to the scene of the crime and his frequent interaction with the others suggested he was a part of the criminal conspiracy. The Ninth Circuit concluded that the exclusion of Wang's statements violated Chia's constitutional right to present a defense because the statements were inherently reliable and trustworthy and were key to Chia's defense. (*Chia v. Cambra, supra,* 360 F.3d at p. 1003.) Importantly, there was no one else who could testify to Chia's limited involvement in the murders. In reaching its conclusion, the court observed that Wang's initial statement was made at a time he thought he was going to die. It strongly implicated Wang in the murders, as a shooter and as a coconspirator. Wang then repeated his statement a number of times to officers. In addition, Wang's statements were consistent with the observations of police officers who had watched the area before the murders occurred. (*Id.* at pp. 1004–1005.)

We begin by observing that *Green* and *Chambers* are factually distinguishable from Dixon's situation. In both of these cases, the statement excluded was "I did it," not "he didn't do it." As both opinions point out, these types of statements are inherently reliable because they are against the speaker's penal interest. In both *Green* and *Chambers*, the "I did it" statement excluded the defendant as the guilty party. Also, the statements were made spontaneously and without any motive to exonerate or implicate a coconspirator. That is not the case here. Dixon sought the declaration from Wallace who had already been identified by Wallace's mother as one of the robbers. Wallace was

terminally ill and had known Dixon since they were young. Dixon faced a much longer sentence than Wallace because of Dixon's prior strikes. Wallace's "I did it" statement does not exonerate Dixon. It is only his supplemental statement, that Dixon "didn't do it," that assists the defense. *Chambers* and *Green* do not stand for the proposition that "he didn't do it" statements, such as the one made by Wallace, are inherently reliable and must be admitted under the Fourteenth Amendment contrary to California's rules regarding hearsay.

■ We are not required to follow the majority opinion in *Chia* and decline to do so. In *Chia,* Wang's inculpatory statements did not exculpate Chia and, therefore, there was nothing inherently reliable about them, except that they could be dying declarations. To the contrary, we agree with the dissent, which distinguished its facts from those in *Chambers* and *Green* and questioned the majority's conclusion that reversal was compelled. (*Bank of Italy etc. Assn. v. Bentley* (1933) 217 Cal. 644, 653 [20 P.2d 940] [California not bound by decisions of federal appellate courts]; *Adams v. Pacific Bell Directory* (2003) 111 Cal.App.4th 93, 97 [3 Cal.Rptr.3d 365] [state courts not required to adhere to decisions of federal appellate courts even on federal questions].)

In any event, even if we were bound by *Chia*, we would conclude that Dixon's case is distinguishable from *Chia* as well as from *Chambers* and *Green*. Wallace's declaration was anything but spontaneous. It was a written declaration obtained by Dixon's private investigator. The two obviously had time to confer about it. They were housed in the same jail and Dixon knew in advance that Wallace would sign the declaration. It is only a single statement, not one that was repeated to law enforcement numerous times. Further, it was not reliable since Wallace had a motive to lie. Wallace knew he would most likely be convicted and that Dixon faced a much longer sentence given his prior strike convictions. Wallace also knew he was terminally ill and believed he had nothing to lose.

We conclude that the trial court did not abuse its discretion in finding Wallace's statement to be untrustworthy and excluding it under California's hearsay law. (*People v. Guerra* (2006) 37 Cal.4th 1067, 1113 [40 Cal.Rptr.3d 118, 129 P.3d 321] [abuse of discretion standard applies to any ruling on admissibility of evidence by trial court].) In addition, there is no constitutional error. The holding in *Chambers* is premised on a conclusion that the evidence was reliable. (See *People v. Garcia* (2005) 134 Cal.App.4th 521, 539 [36 Cal.Rptr.3d 181] [*Chambers* does not require admissibility of exculpatory statement when made under unreliable circumstances].) Wallace's exculpatory statements were not inherently reliable and were properly excluded.

*III. Sufficiency of the evidence*\*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*IV. Personal-use enhancement*

Dixon contends that he did not receive adequate notice that he was charged with personal use of a deadly weapon (§ 12022, subd. (b)), the lesser included enhancement found true by the trial court. Dixon was initially charged with personal use of a firearm (§ 12022.53, subd. (b)) with respect to all four counts. The trial court concluded, however, that the prosecution had not proved the gun Dixon used was a firearm—it might have been a pellet gun or BB gun. The guns used in the robbery were never found, and the victims, who were unfamiliar with guns, could only say that the robbers both had what appeared to be guns. The court did find that the prosecutor had established the lesser-included enhancement of personal use of a deadly weapon.

■ A BB gun or pellet gun is not a "firearm" for purposes of sentence enhancements (*People v. Vasquez* (1992) 7 Cal.App.4th 763, 768 [9 Cal.Rptr.2d 255]), but is a "dangerous weapon" as the term is used in section 12022, subdivision (b). (*In re Bartholomew D.* (2005) 131 Cal.App.4th 317, 325–326 [31 Cal.Rptr.3d 728] [pellet guns have an inherent capacity for physical injury and are dangerous weapons under enhancement statute]; *People v. Montalvo* (1981) 117 Cal.App.3d 790, 797 [173 Cal.Rptr. 51] [pellet gun is "dangerous weapon" as term used in § 12022, subd. (b)].)

■ "Due process requires that a criminal defendant be given fair notice of the charges to provide an opportunity to prepare a defense and to avoid unfair surprise at trial. [Citations.] An accusatory pleading stating the charged offense provides the defendant not only with notice of the offense actually charged but also with notice of any necessarily included offenses. [Citation.]" (*People v. Tardy* (2003) 112 Cal.App.4th 783, 786 [6 Cal.Rptr.3d 24].) Respondent contends that the personal-use-of-a-deadly-weapon enhancement is a lesser included offense of a personal-use-of-a-firearm enhancement and, as a result, notice of the charged enhancement provided notice of the lesser included enhancement of which Dixon was convicted. We agree.

■ "[A] lesser offense is necessarily included in a greater offense if either the statutory elements of the greater offense, or the facts actually alleged in the accusatory pleading, include all the elements of the lesser offense, such that the greater cannot be committed without also committing the lesser."

---

\*See footnote, *ante*, page 985.

(*People v. Birks* (1998) 19 Cal.4th 108, 117 [77 Cal.Rptr.2d 848, 960 P.2d 1073].) Dixon was charged with personal use of a firearm within the meaning of section 12022.53, subdivision (b).     ■     One cannot commit an offense by personally using a firearm and not at the same time commit an offense by personally using a deadly weapon. This is due to the fact that a deadly weapon is any instrument that is capable of being used to inflict death or great bodily injury and a firearm is unquestionably a deadly weapon. (*People v. Aguilar* (1997) 16 Cal.4th 1023, 1029 [68 Cal.Rptr.2d 655, 945 P.2d 1204]; see *People v. Turner* (1983) 145 Cal.App.3d 658, 684 [193 Cal.Rptr. 614] [every gun use necessarily includes violation of § 12022, subd. (a)], overruled on other grounds in *People v. Newman* (1999) 21 Cal.4th 413, 422–423, fn. 6 [87 Cal.Rptr.2d 474, 981 P.2d 98]; *People v. Allen* (1985) 165 Cal.App.3d 616, 627 [211 Cal.Rptr. 837] [court properly may reduce enhancements for personal use of firearm to armed enhancements within the meaning of § 12022, subd. (a), because one is lesser included of the other].) "It is of no consequence that the evidence at trial might also establish guilt of another and lesser crime than that charged. To constitute a lesser and necessarily included offense it must be of such a nature that as a matter of law and *considered in the abstract* the greater crime cannot be committed without necessarily committing the other offense. [Citations.]" (*People v. Benjamin* (1975) 52 Cal.App.3d 63, 71 [124 Cal.Rptr. 799].) Since section 12022, subdivision (b), is included within section 12022.53, subdivision (b), Dixon was adequately apprised that the prosecution was seeking to prove the elements which comprise a section 12022, subdivision (b), enhancement. Consequently, there was no lack of notice or due process violation.

■     Likewise, when Dixon waived his right to a jury trial on the allegations of the enhancement, he waived his rights to be tried on the lesser included enhancements. (§ 1159; *People v. Beller* (1985) 172 Cal.App.3d 904, 911 [218 Cal.Rptr. 488] [jury or court may find defendant guilty of offense charged, necessarily included offense, or attempt to commit offense].) *People v. Sanders* (1987) 191 Cal.App.3d 79 [236 Cal.Rptr. 197], cited by Dixon, is not applicable. In *Sanders*, a third count was added after the defendant waived his right to a jury trial on the first two counts of the information. Here, Dixon waived his right to have the greater enhancement tried by a jury; consequently, he also waived his right to a jury trial on the lesser included enhancement.

V., VI.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

---

*See footnote, *ante*, page 985.

## *DISPOSITION*

The judgment is affirmed. The trial court shall correct the abstract to reflect that trial was by the court and distribute new copies to the appropriate authorities.

Cornell, J., and Dawson, J., concurred.

A petition for a rehearing was denied August 15, 2007, and appellant's petition for review by the Supreme Court was denied October 24, 2007, S155781.