Filed 6/5/14  P. v. Torres CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D065280 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. RIF1103836) |
| JOSEPH DOMINIC TORRES, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Riverside County, Elisabeth Sichel, Judge.  Affirmed.

George L. Schraer for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Senior Assistant Attorney General, A. Natasha Cortina and Sean M. Rodriguez, Deputy Attorneys General, for Plaintiff and Respondent.

# I.

# INTRODUCTION

A jury found Joseph Dominic Torres guilty of robbery (Pen. Code, § 211)[1] (count 1) and criminal street gang activity (§ 186.22, subd. (a)) (count 2). With respect to count 1, the jury found that Torres used a deadly or dangerous weapon in the commission of the offense (§ 12022, subd. (b)(1)), and that he committed the offense for the benefit of, at the direction of, or in association with, a criminal street gang with the specific intent to promote, further, or assist the criminal conduct of gang members (§ 186.22, subd. (b)). The trial court sentenced Torres to 13 years in prison, consisting of the lower term of two years on count 1, plus an additional consecutive one year for the deadly or dangerous weapon enhancement (§ 12022, subd. (b)(1)), plus an additional consecutive 10 years for the gang enhancement (§ 186.22, subd. (b)). The court stayed imposition of sentence on count 2 pursuant to section 654.

On appeal, Torres claims that the trial court erred in denying a motion to exclude a statement that he gave to police on the night of his arrest, on the ground that he did not waive his *Miranda*[2] rights prior to giving the statement. Torres also claims that the deadly or dangerous weapon sentence enhancement must be stricken because the record does not contain substantial evidence that the BB gun that he used to commit the robbery constituted a "a deadly or dangerous weapon." (§ 12022, subd. (b)(1).)

---

[1]     Unless otherwise specified, all subsequent statutory references are to the Penal Code.

[2]     (*Miranda v. Arizona* (1966) 384 U.S. 436.)

We affirm the judgment.

## II.

## FACTUAL AND PROCEDURAL BACKGROUND

A.    *The People's evidence*

1.    *The charged offenses*

On June 17, 2011, at approximately 10:00 p.m., Torres approached victim Andrew Cortez in a dark alley behind an apartment complex in Corona. The complex is located in the territory of the Corona Visioneros Locos (hereinafter CVL) criminal street gang. Torres's friend, and fellow CVL gang member, Vincent Maciel, stood approximately eight feet behind Torres.

Torres asked Cortez where he was from. Cortez responded that he was from Mira Lorna, and put his hand out for a handshake. Torres slapped Cortez's hand down, mumbled his name, and said that he was from the "Corona Visioneros." As Torres proclaimed his gang affiliation, he took out what appeared to be a large black handgun[3] and placed the gun against Cortez's ribs. Torres asked Cortez what was in his pockets. Cortez initially denied having anything in his pockets, which caused Torres to push the gun further into Cortez's ribs. Cortez then admitted that he had $40, which he handed to Torres. Torres and Maciel began to walk away, and started running after they saw Cortez take out his phone. Cortez called the police. An officer responded to the scene of the

---

[3]    The People presented evidence at trial that the gun was actually a BB gun.

3

robbery and spoke with Cortez. Cortez provided the officer with a description of the robber and his accomplice, including the clothing that the two had been wearing.

2. *Torres's arrest*

At approximately 10:50 that same evening, police officers went to Maciel's apartment and found Torres hiding underneath a blanket behind a couch. He had a $20 bill, a $5 bill, and several $1 bills in his pockets. Near Torres was a pile of clothes similar to those worn by the robber. Officers searched a closet and found an unloaded semiautomatic BB gun. Maciel and two documented CVL gang members were also in the apartment.

3. *Torres's police interview*

Corporal Jason Waldon of the Corona Police Department interviewed Torres shortly after his arrest.[4] At the outset of the interview, Waldon asked Torres various questions about his background, including how old he was. Torres stated that he was 15 years old. After being read his *Miranda* rights, Torres stated that he understood the rights.[5]

During the interview, Torres admitted having committed crimes with Maciel, including the charged robbery. Torres initially claimed that he and Maciel committed the robbery because they "were bored," and later stated that he "needed money." Torres also admitted using a BB gun to commit the robbery. Torres stated that if he and Maciel had

---

[4]     A second officer joined the interview while it was in progress.

[5]     We discuss the facts surrounding the *Miranda* admonishment in detail in part III.A., *post*.

4

attempted to rob someone who had a gun—such as a police officer—Maciel would have stabbed the officer. After initially denying being a member of a gang or having a gang moniker, Torres's implicitly admitted that he was a "gangbanger."[6]

### 4. *Gang testimony*

Waldon also testified at trial as a gang expert. Among other topics, Waldon testified that he believed that Torres and Maciel were active CVL gang members. In addition, Corporal Waldon testified that in his opinion, a hypothetical robbery based on the facts of the robbery in this case would have been committed for the benefit of, at the direction of, or in association with, CVL.

### B. *The defense*

Torres's mother testified that she had not seen Torres with any tattoos and denied having seen any gang graffiti or drawings in Torres's bedroom. Torres's mother also stated that she was not aware that Torres was socializing with people who might be gang members.

---

6      Specifically, during the interview, the following colloquy occurred:
     "[Torres]: [Y]ou don't have [a] mind like me.
     "[Officer]: What do you mean I don't have a mind—
     "[Torres]: You don't have a mind like a gangbanger.
     "[Officer]: How do you know that?
     "[Torres]: 'Cause obviously you don't. You're working here. If you're doing this, you don't have a mind like us."

DISCUSSION

A.  *The trial court did not err in denying Torres's motion to exclude his statement to the police on the ground that he did not waive his* Miranda *rights before giving the statement*

Torres claims that the trial court erred in denying his motion to exclude his statement to the police on the ground that he did not waive his *Miranda* rights prior to giving the statement.

1.  *Governing law*

    a.  *General principles of law governing* Miranda *claims*

In *People v. Williams* (2010) 49 Cal.4th 405, 425 (*Williams*) the California Supreme Court provided a summary of the law governing *Miranda* claims:

> "The [United States Supreme Court] has stated in summary that to counteract the coercive pressure inherent in custodial surroundings, '*Miranda* announced that police officers must warn a suspect prior to questioning that he has a right to remain silent, and a right to the presence of an attorney. [Citation.] . . . Critically, however, a suspect can waive these rights. [Citation.] To establish a valid waiver, the State must show that the waiver was knowing, intelligent, and voluntary under the "high standar[d] of proof for the waiver of constitutional rights [set forth in] *Johnson v. Zerbst* [1938] 304 U.S. 458." ' [Citation.]
>
> " 'The prosecution bears the burden of demonstrating the validity of the defendant's waiver by a preponderance of the evidence.' [Citations.] In addition, '[a]lthough there is a threshold presumption against finding a waiver of *Miranda* rights [citation], ultimately the question becomes whether the *Miranda* waiver was [voluntary,] knowing [,] and intelligent under the totality of the circumstances surrounding the interrogation.' [Citation.] On appeal, we conduct an independent review of the trial court's legal determination and rely upon the trial court's findings on disputed facts if supported by substantial evidence. [Citation.]"

b.       *A juvenile's waiver of* Miranda *rights*

"When a juvenile's waiver is at issue, consideration must be given to factors such as 'the juvenile's age, experience, education, background, and intelligence, and . . . whether he has the capacity to understand the warnings given him, the nature of his Fifth Amendment rights, and the consequences of waiving those rights.' [Citation.]" (*People v. Nelson* (2012) 53 Cal.4th 367, 375 (*Nelson*).)

In *Nelson*, our Supreme Court concluded that there was "no dispute[7] that [a juvenile] defendant was properly questioned" (*Nelson, supra*, 53 Cal.4th at p. 375), after he implicitly waived his *Miranda* rights under the following circumstances:

> " 'At the time of his interview, Nelson was 15 years old.  He had two prior arrests, the most recent resulting in a several month stay in juvenile hall.  Before Nelson was questioned, the detective advised him they needed to go through the "formality" of a *Miranda* right advisement.  Nelson agreed he had heard the warning before and specifically told the detective he understood he had the right to remain silent.  Nelson said he understood he could stop the detective at any time if he did not understand what rights he was waiving.  His voluntary responses to the deputies' subsequent questions indicate he understood his *Miranda* rights and waived them.' "

The *Nelson* court stated, "Although [Nelson] 'did not expressly waive his *Miranda* rights, he did so implicitly by willingly answering questions after acknowledging that he understood those rights.' [Citation.]" (*Nelson, supra*, 53 Cal.4th at p. 375.)

----

7       The *Nelson* court noted that the defendant conceded the validity of his waiver on appeal. (*Nelson, supra*, 53 Cal.4th at p. 375.)

c.      Berghuis v. Thompkins *(2010) 560 U.S. 370*

In *Berghuis v. Thompkins, supra,* 560 U.S. at page 384 (*Berghuis*), the United States Supreme Court held, "Where the prosecution shows that a *Miranda* warning was given and that it was understood by the accused, an accused's uncoerced statement establishes an implied waiver of the right to remain silent."

The *Berghuis* court acknowledged that, "Some language in *Miranda* could be read to indicate that waivers are difficult to establish absent an explicit written waiver or a formal, express oral statement." (*Berghuis, supra,* 560 U.S. at. p. 383.) However, the *Berghuis* court explained, "The course of decisions since *Miranda,* informed by the application of *Miranda* warnings in the whole course of law enforcement, demonstrates that waivers can be established even absent formal or express statements of waiver that would be expected in, say, a judicial hearing to determine if a guilty plea has been properly entered." (*Ibid.*)

The *Berghuis* court explained that prior case law had established that courts may find an *implied* waiver of *Miranda* rights:

> "One of the first cases to decide the meaning and import of *Miranda* with respect to the question of waiver was *North Carolina v. Butler* [(1979) 441 U.S. 369 (*Butler*)]. The *Butler* Court, after discussing some of the problems created by the language in *Miranda,* established certain important propositions. *Butler* interpreted the *Miranda* language concerning the 'heavy burden' to show waiver, 384 U.S., at 475, in accord with usual principles of determining waiver, which can include waiver implied from all the circumstances. See *Butler, supra,* at 373, 376. And in a later case, the Court stated that this 'heavy burden' is not more than the burden to establish waiver by a preponderance of the evidence. *Colorado v. Connelly* [1986] 479 U.S. 157, 168.

8

"The prosecution therefore does not need to show that a waiver of *Miranda* rights was express. An 'implicit waiver' of the 'right to remain silent' is sufficient to admit a suspect's statement into evidence. *Butler, supra,* at 376. *Butler* made clear that a waiver of *Miranda* rights may be implied through 'the defendant's silence, coupled with an understanding of his rights and a course of conduct indicating waiver.' 441 U.S., at 373. The Court in *Butler* therefore 'retreated' from the 'language and tenor of the *Miranda* opinion,' which 'suggested that the Court would require that a waiver . . . be "specifically made." ' *Connecticut v. Barrett* [(1987)] 479 U.S. 523, 531–532 (Brennan, J., concurring in judgment)." (*Berghuis, supra,* 560 U.S. at pp. 383-384.)

The *Berghuis* court also emphasized that the key to finding an implied waiver of *Miranda* rights where a *Miranda* warning has been given is evidence that the accused *understood* those rights.

"If the State establishes that a *Miranda* warning was given and the accused made an uncoerced statement, this showing, standing alone, is insufficient to demonstrate 'a valid waiver' of *Miranda* rights. *Miranda, supra,* at 475. The prosecution must make the additional showing that the accused understood these rights." (*Berghuis, supra,* 560 U.S. at p. 384.)

The *Berghuis* court summarized its holding by stating, "In sum, a suspect who has received and understood the *Miranda* warnings, and has not invoked his *Miranda* rights, waives the right to remain silent by making an uncoerced statement to the police." (*Berghuis*, *supra*, 560 U.S. at pp. 388-389.)

Applying this law, the *Berghuis* court concluded that, "The record in this case shows that Thompkins waived his right to remain silent." (*Berghuis*, *supra*, 560 U.S. at p. 385.) In reaching this conclusion, the court reasoned in part:

"There is no basis in this case to conclude that he did not understand his rights; and on these facts it follows that he chose not to invoke or rely on those rights when he did speak. First, there is no contention

9

that Thompkins did not understand his rights; and from this it follows that he knew what he gave up when he spoke. [Citation.] There was more than enough evidence in the record to conclude that Thompkins understood his *Miranda* rights. Thompkins received a written copy of the *Miranda* warnings; Detective Helgert determined that Thompkins could read and understand English; and Thompkins was given time to read the warnings. Thompkins, furthermore, read aloud the fifth warning, which stated that 'you have the right to decide at any time before or during questioning to use your right to remain silent and your right to talk with a lawyer while you are being questioned.' . . . He was thus aware that his right to remain silent would not dissipate after a certain amount of time and that police would have to honor his right to be silent and his right to counsel during the whole course of interrogation. Those rights, the warning made clear, could be asserted at any time. Helgert, moreover, read the warnings aloud.

"Second, Thompkins's answer to Detective Helgert's question about whether Thompkins prayed to God for forgiveness for shooting the victim is a 'course of conduct indicating waiver' of the right to remain silent. [Citation.] If Thompkins wanted to remain silent, he could have said nothing in response to Helgert's questions, or he could have unambiguously invoked his *Miranda* rights and ended the interrogation. The fact that Thompkins made a statement about three hours after receiving a *Miranda* warning does not overcome the fact that he engaged in a course of conduct indicating waiver. Police are not required to rewarn suspects from time to time. Thompkins's answer to Helgert's question about praying to God for forgiveness for shooting the victim was sufficient to show a course of conduct indicating waiver. This is confirmed by the fact that before then Thompkins had given sporadic answers to questions throughout the interrogation.

"Third, there is no evidence that Thompkins's statement was coerced." (*Berghuis*, *supra*, 560 U.S. at pp. 385-386.)

2.     *Factual and procedural background*

Prior to trial, the People filed a trial brief and an exhibit list in which they indicated that they intended to introduce in evidence a recorded statement that Torres gave to the police on the night of charged offenses.

10

During a pretrial hearing, defense counsel requested a hearing pursuant to Evidence Code section 402[8] "based upon *Miranda*." The court indicated that it would attempt to hold the hearing the following day.

The following day, the court held the Evidence Code section 402 hearing for the purpose of determining the admissibility of Torres's statement to Corporal Waldon. The hearing began with defense counsel calling Torres as a witness.[9] Torres testified that at the time of the police interview he was 15 years old, in 11th grade, and attending summer school. Torres explained that he was attending summer school because he was missing credits, since he had been "moving from school to school." According to Torres, he "would get decent grades, like Bs and Cs." Torres agreed with defense counsel that his grade point average for the prior year was probably "a little bit higher" than a 2.0. Torres also explained that he had had a problem focusing in school and that he had been given medication for the problem when he was "little."

Torres testified that on the night in question he was under the influence of marijuana and methamphetamine and that he did not remember being read his *Miranda*

8    Evidence Code section 402, subdivision (b) provides, "The court may hear and determine the question of the admissibility of evidence out of the presence or hearing of the jury; but in a criminal action, the court shall hear and determine the question of the admissibility of a confession or admission of the defendant out of the presence and hearing of the jury if any party so requests."

9    At the outset of the hearing, the prosecutor stated, "Your Honor, it's my understanding that [the] defense is going to call the defendant to the stand in order to establish an issue with regards to the *Miranda* warnings. I'm happy to call Officer Waldon, but I think that it would be better if I called him second." Defense counsel responded, "It doesn't matter to me how we go." The court then permitted defense counsel to call Torres to the stand.

rights before giving a statement to the police. Torres also testified that he had never been arrested before. However, when asked by defense counsel, "Do you know what it means when somebody tells you that you have a right to have an attorney present?" Torres responded, "Yeah." When defense counsel showed Torres a transcript of his interview with the police, which contained a *Miranda* advisement, the following colloquy occurred:

> "[Defense counsel]: You see where it says 'Yes' after that advisement?
>
> "[Torres]: Yeah.
>
> "[Defense counsel]: Now . . . why did you tell the officer 'Yes' or 'Yeah'?
>
> "[Torres]: I'm not sure. . . . I can't recall even that conversation.
>
> "[Defense counsel]: Were you saying yeah because you understood what he said or yeah to make him happy?
>
> "[Torres]: Just like yeah to get the conversation over with, to get it through."

Torres also explained that he "wasn't really paying attention to what [Corporal Waldon] said," when Corporal Waldon was advising him of his right to right to remain silent.

On cross-examination, Torres testified that English is his first language, and that he grew up learning to read and write in English. Torres admitted that he understood some of Corporal Waldon's questions during the interview, but stated that he did not understand the *Miranda* admonishment.

After Torres testified, defense counsel indicated that he would next call Corporal Waldon as a witness. The following colloquy then occurred:

12

"[The court]: I'm a little bit confused because I thought the People have the burden of proving that *Miranda* was complied with. Is that inaccurate?

"[The prosecutor]: No. I think that's correct, your Honor. I just didn't know what [the] defense was saying with regards to that because he wasn't disputing that *Miranda* was given. He was saying the capacity to waive was not present. And so I just—

"[The court]: I see. Okay. So you don't know. He is conceding the issue that the *Miranda* warning was actually given. The issue is whether or not the defendant had the capacity to understand what he was doing.

"[Defense counsel]: Yes."

The court then permitted defense counsel to call Corporal Waldon as a witness. Waldon testified that he knew that Torres was about 15 years old when he interviewed him. Waldon was also aware that Torres had not previously been arrested. According to Waldon, Torres appeared tired and his eyes were slightly red, but he did not appear fidgety and his pupils looked normal.

Corporal Waldon testified that he read Torres his *Miranda* rights from a form, and that he paused between reading each right. The court then viewed the first few minutes of a video recording of Corporal Waldon's interview of Torres, during which the following colloquy occurs:

"[Waldon]: I am going to read you your rights. If you have any questions while we're going through this just feel free to let me know anytime, okay? Okay?

"[Torres]: All right.

"[Waldon]: All right. You have the right to remain silent. Anything you say can and may be used against you in a court of law. You

13

have the right to talk to a lawyer and have him present with you while you are being questioned. If you cannot afford to hire a lawyer, one will be appointed to represent you before any questioning if you wish. Do you understand each of these rights that I explained to you? Yes or no?

"[Torres]: Yeah."[10]

Defense counsel asked Corporal Waldon whether "during the end of this conversation," he had asked Torres to initial a form. Waldon explained that he had Torres "initial [a] form acknowledging his rights I read to him prior to asking questions."[11]

On cross-examination, Corporal Waldon testified that he believed Torres's responses to his questions were clear, stating, "It seemed to me by his responses that he understood the questions being that his answers somehow reflected the question I was asking." Waldon also explained that when he asked Torres to initial the admonishment form, he also asked Torres whether he had understood the rights that Waldon had read to him. Torres responded "yeah," and Waldon indicated Torres's response on the admonishment form.

After Corporal Waldon testified, the court admitted the video recording of the interview in evidence.

---

[10] The video recording of the interview is in the record on appeal and has been transmitted to this court.

[11] The admonishment form is also in the record on appeal and has been transmitted to this court.

14

The People also offered the written *Miranda* admonishment form in evidence. The form contains standard *Miranda* admonishments and states, "Do you understand each of these rights that I have explained to you?" On a line next to this question is the handwritten notation "Yea." On the following line, the form states, "Having these rights in mind, do you wish to talk to us now?" Next to this question are the initials, "JT." At the bottom of the form, Torres printed and signed his name. The court reviewed the form and asked Corporal Waldon whether Torres had initialed the form and signed it. Corporal Waldon responded in the affirmative.

After receiving evidence, the court heard argument from counsel. Defense counsel argued that Torres did not knowingly and intelligently waive his *Miranda* rights. Counsel emphasized that Torres was just 15 years of age at the time of the interview, that he had never been arrested before, and that he had been using drugs at the time. Counsel argued further, "I think you have a child here who was basically acquiescing into [*sic*] the officer's statement that yeah, he kind of understood the *Miranda* warnings even though I don't think he actually understood them."

The prosecutor noted that Torres was in 11th grade and that English was his first language. The prosecutor argued further:

> "The officer asked him, as I explain these things to you, if there's
> anything you don't understand, stop me. And then he began to read
> the rights. As the Court heard, he paused for long periods between
> each right. [¶] And after he read the rights, he asked him, [']Do you
> understand those rights that I explained to you? Yes or no.['] And
> Mr. Torres said, 'Yea[h]' and began talking to him and having a very
> long conversation. At no point invoking. In fact, later in the
> interview when the officer gave him the written copy of it, he . . .
> had an opportunity to look at it, initial and sign, which the Court

15

knows from the defendant sitting in court reading the first three pages of the transcript that he can read. He's got over a 2.0 G.P.A."

After hearing argument from counsel, the trial court ruled that "the standard for *Miranda* has been met." The court reasoned in part:

"I really was most impressed by watching the audio [*sic*]. The defendant talked sense. He didn't ramble when he was asked a question. He did not appear to be under the influence of methamphetamine, at least none of the classic signs. He wasn't twitching. There was no residue on his mouth that I could observe. He didn't seem to have a dry mouth. "

The court also stated:

"[H]e answered every question making sense. And not only that, he corrected the officer when the officer initially asked him, you live over somewhere other [*sic*]. He said no, I live over here. So clearly he was able to follow the questions . . . .

"It was . . . he was cold, and he did appear to be drowsy, but looking on the tape, I mean he clearly understood what was going on. He understood what the officer was telling him enough to the point where he could correct the officer.

"He's obviously of at least average or better than average intelligence. He said he's had a lot of trouble and gone to a lot of schools, but he's still getting Bs and Cs, and he said he was only going to summer school because he was missing credits from moving around so much. Not because he flunked anything.

"And so I just – he wasn't on meth that night or he's taken it for so long that . . . it takes a lot more for him to have the same impact it would on someone else. He was tracking. He was tracking certainly well enough to understand the nature of his rights. I can't find there was any violation of *Miranda*. . . . I cannot make a finding that the defendant did not understand the nature of his rights or what he was being told. I find that he clearly did from my observation of the video. That's why I wanted to see it because in these cases, just hearing the bare words doesn't mean—if he's slurring and falling out of his chair, that's one thing. He was sitting there. He wasn't looking the officer in the eye, but he didn't do that at any time

16

particularly.  He was looking around and yawning and everything else.  His questions [*sic*] made sense."

3.     *Application*

Torres claims that the trial court should have excluded his statement to the police because "the record does not show either an express or implied waiver of *Miranda* rights."[12]  We disagree.

The People presented substantial evidence that Corporal Waldon read a full and proper *Miranda* admonishment to Torres, that Torres understood the admonishment, and that Torres provided an uncoerced[13] statement to Waldon immediately after being advised of his rights.  These facts strongly support a finding of waiver.  (See *Berghuis*, *supra*, 560 U.S. at pp. 388-389 ["In sum, a suspect who has received and understood the *Miranda* warnings, and has not invoked his *Miranda* rights, waives the right to remain silent by making an uncoerced statement to the police"]; *Nelson, supra*, 53 Cal.4th at p. 375 ["[15-year-old defendant's] voluntary responses to the deputies' subsequent questions indicate he understood his *Miranda* rights and waived them"]; *People v. Lessie* (2010) 47

---

12     Torres acknowledges that "[a]t the hearing in the trial court, appellant did not expressly state that he was seeking to have the pretrial statement excluded on the ground of the lack of wavier of *Miranda* rights.  Instead, defense counsel characterized the *Miranda* issues as being the lack of understanding of the *Miranda* rights and the lack of capacity to waive those rights."
     We assume for purposes of this decision that Torres may raise on appeal his contention that he did not waive his *Miranda* rights, notwithstanding that he pursued a different theory of exclusion premised on *Miranda* in the trial court.  (But see *People v. Polk* (2010) 190 Cal.App.4th 1183, 1194 [defendant forfeited objection to substantive adequacy of *Miranda* warnings although she had raised other objections based on *Miranda* in trial court].)

13     Torres does not contend that his statement was coerced.

17

Cal.4th 1152, 1169 (*Lessie*) ["While [16-year-old] defendant did not expressly waive his *Miranda* rights, he did so implicitly by willingly answering questions after acknowledging that he understood those rights"].)

Although Torres does not attempt to distinguish *Berghuis* on appeal,[14] he does stress that he was just 15 years old at the time of the police interview and that he had never previously been arrested.[15] While Torres is correct that such circumstances must be considered (*Nelson, supra*, 53 Cal.4th at p. 375), they did not require that his statement be excluded. With respect to Torres's age, the California Supreme Court has found implied *Miranda* waivers with respect to defendants of a similar age. (See *ibid.*; *Lessie, supra*, 47 Cal.4th at p. 1169.) While Torres's lack of prior arrests may demonstrate an unfamiliarity with *Miranda* rights, Torres expressly stated during the interview that he understood his rights, and he acknowledged at the hearing that he understood the meaning of the "right to have an attorney present."

---

14      Neither Torres nor the People cited *Berghuis* in their briefing on appeal.

15      Torres also relies on a 1981 opinion of the Connecticut Supreme Court, *State v. Wilson* (1981) 183 Conn. 280, 285 (*Wilson*), in which the court concluded that a defendant had not knowingly and intelligently waived his *Miranda* rights. The *Wilson* court noted that the State presented evidence that the defendant had made an inculpatory statement to a police detective after the detective "read[] [the defendant] the entire litany of rights, . . . asked the defendant if he understood[,] and the defendant replied simply, 'Yes, I do.' " (*Wilson, supra*, at p. 285.) In light of the subsequent United States Supreme Court decision in *Berghuis*, we decline to follow *Wilson*. (See *Berghuis, supra*, 560 U.S. at p. 384 ["Where the prosecution shows that a *Miranda* warning was given and that it was understood by the accused, an accused's uncoerced statement establishes an implied waiver of the right to remain silent"].)

18

In considering the defendant's education, background, and intelligence, the record contains evidence that Torres was in summer school and had achieved passing grades during the prior school year. The trial court reasonably found him to be of "at least average or better than average intelligence." (See *Lessie*, *supra,* 47 Cal.4th at p. 1169 ["Defendant was, at the time of his interrogation, 16 years old and, while no longer in school, had completed the 10th grade and held jobs in retail stores"].) In addition, while Torres contended in the trial court that his capacity to understand the *Miranda* warnings was impaired by his drug use, there is substantial evidence in the record to support the trial court's rejection of this contention.

We see nothing in the "totality of the circumstances surrounding the interrogation" (*Williams, supra*, 49 Cal.4th at p. 425) that would undermine the conclusion that Torres "implicitly" waived his *Miranda* rights "by willingly answering questions after acknowledging that he understood those rights." (*Lessie*, *supra,* 47 Cal.4th at p. 1169.) A review of the video recording of the interview suggests that Torres was willing to speak with the police, was relatively articulate and responded appropriately to questioning. Torres did not request to speak with a parent or other authority figure at any time. (Compare with *Lessie*, *supra,* at pp. 1158, 1169 [finding 16-year-old defendant implicitly waived *Miranda* rights notwithstanding the fact he asked to speak with his father at outset of interrogation].) Finally, after speaking freely with the officers, Torres, without hesitation, signed a waiver form at the end of the interview in which he indicated both that he understood his *Miranda* rights and that, having such rights in mind, he wished to speak with the officers. (Compare with *Berghuis*, *supra*, at p. 375 [finding

implied waiver despite the fact defendant was largely *silent* through the first two hours and 45 minutes of the interrogation and *declined* to sign a form indicating that he understood his *Miranda* rights].)

In short, as in *Lessie*, "Nothing in this background, or in the transcript of defendant's interrogation, suggests his decision to waive his *Miranda* rights was other than knowing and voluntary." (*Lessie*, *supra,* 47 Cal.4th at p. 1169.) Accordingly, we conclude the trial court did not err in denying Torres's motion to exclude his statement to the police on the ground that he did not knowingly and intelligently waive his *Miranda* rights before giving the statement.

B.      *There is substantial evidence to support the jury's finding that Torres used a deadly or dangerous weapon during the course of the robbery*

Torres claims that the sentence enhancement for use of a deadly or dangerous weapon (§ 12022, subd. (b)(1)) must be stricken because the record does not contain substantial evidence that he used a deadly or dangerous weapon during the robbery. Specifically, Torres claims that an unloaded BB gun is not a deadly or dangerous weapon and that the evidence demonstrates that he used an unloaded BB gun during the robbery. We need not consider whether an unloaded BB gun may be a deadly or dangerous weapon, because the evidence in the record does not demonstrate that the BB gun that Torres used was unloaded.

1.      *Standard of Review*

In *In re Bartholomew D.* (2005) 131 Cal.App.4th 317, 322, the court outlined the standard of review to be applied to a claim that the record does not contain substantial

20

evidence to support a finding that the defendant used a deadly or dangerous weapon during commission of the offense (§ 12022, subd. (b)(1)):

> "When a defendant claims insufficient evidence to support a finding, the appellate court 'must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citation.] We presume the existence of every fact the trier of fact could reasonably deduce from the evidence. [Citation.]" (*In re Bartholomew D.*, *supra*, at p. 322.)

2.	*Governing law*

Section 12022, subdivision (b)(1) provides in relevant part, "A person who personally uses a deadly or dangerous weapon in the commission of a felony or attempted felony shall be punished by an additional and consecutive term of imprisonment in the state prison for one year . . . ."

"A BB gun or pellet gun . . . is a 'dangerous weapon' as the term is used in section 12022, subdivision (b). (*In re Bartholomew D.*[, *supra*,] 131 Cal.App.4th [at pp. 325-326] [pellet guns have an inherent capacity for physical injury and are dangerous weapons under enhancement statute]; *People v. Montalvo* (1981) 117 Cal.App.3d 790, 797 [pellet gun is 'dangerous weapon' as term used in § 12022, subd. (b)].)" (*People v. Dixon* (2007) 153 Cal.App.4th 985, 1001; see also e.g. *People v. Schaefer* (1993) 18 Cal.App.4th 950, 951 ["a pellet gun [is] a deadly or dangerous weapon within the meaning of Penal Code section 12022, subdivision (b)"].)

21

3. *Application*

Torres concedes on appeal that he used a BB gun during the commission of the robbery. Further, in his brief, Torres "emphasizes that he is not arguing that the prosecution must affirmatively prove that a BB gun which the defendant used during the commission of the crime is loaded."[16] However, he argues that "*when the evidence affirmatively shows that the BB gun the defendant used in the commission of the crime [was] unloaded*, and when the defendant does not use the gun as a bludgeon, the defendant's conduct does not amount to use of a deadly and dangerous weapon with the meaning of section 12022, subdivision (b)." (Italics added.)

In none of the cases cited above stating that "[a] BB gun or pellet gun is . . . a 'dangerous weapon' as the term is used in section 12022, [subdivision] (b)" (*People v. Dixon*, *supra*, 153 Cal.App.4th at p. 1001) has any court suggested that a BB gun ceases to be a dangerous weapon when it is unloaded. On the contrary, the case law suggests that no such evidence is required. (See *In re Bartholomew D.*, *supra,* 131 Cal.App.4th at p. 327 ["A 'true' finding under section 12022 does not require that the weapon necessarily operated"]; *People v. Dixon*, *supra*, 153 Cal.App.4th at p. 1001 ["The guns used in the robbery were never found, and the victims, who were unfamiliar with guns, could only say that the robbers both had what appeared to be guns"]; accord *People v. Lochtefeld* (2000) 77 Cal.App.4th 533, 539 ["even an unloaded gun—a large metal

---

16     Similarly, in his reply brief, Torres argues, "We should presume that a BB gun is operable and loaded and therefore capable of performing its ordinary function."

object—may be used as a bludgeon, and 'it is at least a "dangerous weapon" ' [citation]"].)[17]

Even assuming, strictly for the sake of this opinion, that Torres is correct that a sentence enhancement under section 12022, subdivision (b)(1) is improper when the evidence "affirmatively shows" that the defendant used an *unloaded* BB gun and the defendant did not use the gun as a bludgeon, the evidence in this case does not "affirmatively show[]" that the BB gun that Torres used was unloaded at the time he used it to commit the robbery. The only evidence that Torres cites in his brief with respect to this issue is evidence that that when police found the BB gun in Maciel's apartment *after the robbery*, the BB gun was unloaded. While Torres asserts that "the evidence plainly shows that the BB gun [was] unloaded," evidence that a BB gun was found unloaded some time *after* its use in the commission of crime does not establish that the BB gun was unloaded *during* the commission of the crime.[18] The factual predicate for Torres's legal argument thus fails.

---

[17] With respect to the BB gun at issue in this case, during closing argument, the prosecutor stated, "And when it's not loaded, people can use it with blunt force. You can hit somebody with it. And I would suggest to you when you go back to the deliberation room to hold that BB gun because it's surprisingly heavy even without the [carbon dioxide] cartridge or BBs in it, it's still a sharp project. Yes, it's plastic but it's hard plastic; that if it is used to hit somebody, poke them in the eye, it could cause serious bodily injury . . . ."
 Torres does not dispute that characterization on appeal, and has not transmitted the BB gun as an exhibit to this court.

[18] The exact timing of when the robbery occurred and when the officers found the BB gun is not clear from the record. However, what is clear is that some appreciable amount of time passed between the two events during which the BB gun could have been

Accordingly, we reject Torres's argument that there is not substantial evidence in the record to support the jury's finding that Torres used a deadly or dangerous weapon during the course of the robbery.

IV.

DISPOSITION

The judgment is affirmed.

_____

AARON, J.

WE CONCUR:

_____

NARES, Acting P. J.

_____

IRION, J.

---

unloaded.  Cortez testified that he telephoned the police immediately after the robbery. Officer Jason Gardner of the Corona Police Department testified that he received a radio dispatch call at "about 10:30" on the night of the incident, and that he later came into contact with Cortez.  Corporal Waldon testified that he heard a radio dispatch call about the robbery at "about 10:50."  Waldon testified that he and several officers conducted a search of the streets near Maciel's apartment before going up to the apartment.  Once at the apartment, the officers waited "two or three minutes" before knocking on the door to the apartment.