Filed 3/30/17

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| A.T., Petitioner, v. THE SUPERIOR COURT OF SOLANO COUNTY, Respondent; THE PEOPLE, Real Party in Interest. | A149772 (Solano County Super. Ct. No. J43654) |

**THE COURT:**[1]

Petitioner A.T. filed a writ petition asking us to direct the juvenile court to vacate its November 3, 2016 order denying her request to be released to her mother's custody pending the disposition of criminal charges. The petition alleges the court improperly considered her refusal to accept a "package-deal" plea bargain, as well as the suitability of the Vallejo neighborhood where her mother lives in a two-bedroom apartment, in deciding to detain her. The Attorney General urges us to dismiss A.T.'s petition as moot, noting the girl was released on November 10, 2016, upon pleading guilty to a misdemeanor, after serving 16 days in custody.

We exercise our inherent jurisdiction to resolve the issues presented by this writ petition because they are of broad public interest, likely to recur, generally "encountered . . . at a level of 'low visibility' in the criminal process . . . and involve[] asserted errors

---

[1] Before Kline, P.J., Richman, J., and Stewart, J.

1

. . . not ordinarily reviewable on appeal." (*In re William M.* (1970) 3 Cal.3d 16, 24-26 (*William M.*); see also *In re Yvonne W.* (2008) 165 Cal.App.4th 1394, 1403-1404; *In re Raymond G.* (1991) 230 Cal.App.3d 964, 967.) Further, we note that, after pleading guilty, A.T. filed a motion to withdraw her November 9, 2016 plea of guilty. That motion is still pending, in accordance with a stay we issued on December 23, 2016. This opinion is intended to guide the juvenile court in considering A.T.'s motion to withdraw her plea.

## BACKGROUND

A.T. is enrolled in high school in Fairfield, California, where her attendance is regular, and she earns passing grades. She has no prior delinquent history. On October 24, 2016, she was riding with another minor in a car driven by her brother, who is also a minor with no delinquent history. Police stopped the car because its registration had expired. When they learned that no one inside the vehicle possessed a valid driver's license, they arrested her brother for driving without a license. While performing an inventory search in preparation for the vehicle to be towed, officers found a small handgun wrapped in a shirt inside a backpack that was inside the trunk. At that point, A.T. and the other minor were arrested.

A.T. waived her *Miranda* rights, and told police that her brother had found the gun early that morning, and shown it to her. She said they had agreed to wrap it up and put it inside her backpack, and to leave it inside the trunk of the car to show later to their father. The father of her brother's girlfriend subsequently reported the gun was stolen from him.

By a petition filed October 25, 2016, pursuant to Welfare and Institutions Code section 602, subdivision (a),[2] A.T. was charged with grand theft (count 1); possession of a firearm by a minor (count 2); and carrying a loaded/stolen firearm (count 3).[3] At her arraignment on October 26, 2016, A.T. denied each charge. Despite her youth, lack of prior delinquent history, solid ties to the community, and positive parental support, the

---

[2] All statutory references are to the Welfare and Institutions Code.

[3] The record indicates that brother was charged with an additional crime, count 4, presumably related to his driving without a license.

2

juvenile court rejected the probation department's recommendation that she be conditionally released to her mother subject to home supervision.

On November 3, 2016, after A.T. had spent 10 days in custody, the court held a readiness conference and a hearing on the prosecutor's motion to join her case with that of her brother. A.T. objected to joinder, explaining that she believed her brother would provide exculpatory testimony if he had the opportunity to testify at her separate trial. He also objected to joinder. After hearing argument, the juvenile court joined the two matters over the minors' objections.

The court then inquired whether the parties had made any progress toward resolving the cases. The prosecutor responded that she had offered the minors a "package deal," whereby A.T. would plead guilty to count 3, as a misdemeanor, and brother would plead guilty to count 3, as a misdemeanor, as well as count 4, and both minors would receive formal probation. A.T.'s brother wanted to take the deal, but she did not. The court indicated it was willing to accept her brother's plea, and to let A.T.'s case go forward. The prosecutor insisted, however, that the plea offer depended on both minors' admitting the charges.

A.T. then renewed her request to be released from detention to the custody of her mother, who was present in court.[4] At the court's prompting, A.T.'s mother provided her address. The court then asked, "What's at [that address]? What is the building?"

A.T.'s mother said, "Well, . . . they have a lot of storefronts, but . . . ."

The court agreed, "Yes, they do. It's downtown Vallejo, right."

A.T.'s mother then said, "Yes, sir. It's nice. It's quiet. I mean, the building is quiet. It's not a lot of drama in there. I don't know what else to say. I have the only two-bedroom in there."

---

[4] The record reflects that A.T.'s father was the custodial parent. At the time of the hearing, however, he had recently separated from his wife, A.T.'s stepmother. While he looked for a new apartment, he had been sleeping at his place of business, while A.T. lived with an aunt. A.T.'s father and mother were both present at the hearing, along with a family friend, Mrs. Nelson, who also offered to take custody of the minors pending disposition of the charges.

3

The court responded, "I don't know what to say either. Okay? I'm extremely familiar with Vallejo. I grew up in Vallejo. I've got a pretty good feel of what's happening in downtown Vallejo."

After further discussion, the court announced, "I'll be frank with you, I'm disappointed that we're not able to find some resolution of this today. . . . I'd like to have you come back and give this one more try on another readiness conference." Counsel for A.T. then asked to pass the matter, and the court obliged, saying, "Anything to see if we can find a resolution, yes. We'll pass these cases briefly."

After a lunch recess, the court re-called the cases. At the afternoon hearing, counsel for A.T. informed the court that she had looked up A.T.'s mother's address on Google Maps, and confirmed it appeared to be a residential apartment complex above a business located on the first floor.

The court stated, "Well, I believe that there's a residential unit. That's not the only reason that I've denied the custodial status be changed." The court explained its concern for A.T.'s safety, and stated it was not going to change its mind about keeping her detained at that point. The court then inquired once more if it needed to set the matters for a contest, or whether some resolution had been reached.

Her brother's counsel indicated that his client's position remained the same.

A.T.'s counsel asked the court to clarify its concerns for A.T.'s safety due to her mother's neighborhood. The court responded, "Well, it's downtown Vallejo . . . about two blocks away from the Marina apartments, which are—have some notoriety about the nature of the criminal activity that takes place there. I know this area very, very well. Okay?"

Counsel for A.T. reiterated that her client was a 14-year-old child with no prior record and that she needed to be home with her mother. At that point, counsel stated that A.T. was prepared to resolve her case for a misdemeanor, in accordance with the offered plea bargain. She went on to respond to the court's comments about downtown Vallejo, noting that families who are poor cannot afford to live wherever they choose. Counsel

4

stated that downtown Vallejo is where A.T.'s mother could afford to live, and A.T. had been to the apartment before without incident.

While explaining that it did not have enough information to decide whether going to her mother's home would be in A.T.'s best interest, the court stated, "Okay, I'll tell you what I'd be willing to do with [A.T.]: I'd be willing to grant her probation officer discretion to release her to her mother's home pending the disposition hearing. Okay? And I take it that would be over [the prosecutor's] objection, right?"

The prosecutor affirmed her objection, and the court reiterated its willingness to grant A.T.'s probation officer discretion to release her to her mother on home supervision.

In the midst of her brother's admission colloquy, however, A.T. interrupted through counsel to inform the court that, if the court were to grant A.T.'s release, then A.T. would prefer to hold off on making an admission. Counsel expressed concern that the girl intended to admit to the charges only to expedite her release from custody.

The court responded that it did not want A.T. to do that.

Counsel informed the court that A.T. was prepared to waive time, if the court was still inclined to grant the probation department discretion to release her.

The court then indicated it was no longer willing to grant the probation department discretion to release A.T., saying, "Let's just set it for contest, and you can all think about this carefully. . . . I'm not in the habit of somehow coercing minors to admit to things that they don't—that they're not voluntarily doing. I don't feel comfortable with that."

The prosecutor confirmed that she would accept only a global resolution, and the court responded, "And if we can't get a resolution for [A.T.], then we're just going to set it for a contest?" The prosecutor agreed, and the court set the contest for November 15, 2016, stating once more that it would not release A.T. "[g]iven the nature of these charges."

On November 9, 2016, after she had spent 15 days in custody, at a scheduled readiness conference, A.T. asked once more to be released from detention. The juvenile

court denied that request again, and then again denied A.T.'s next request that the probation department be granted discretion to release her.

Immediately after that, A.T. changed her plea to admit count 3 of the petition. Only then, after she admitted a misdemeanor allegation, did the trial court give the probation department discretion to release her. A.T. filed her petition for writ of mandate on the same day. The following day, she was released to home supervision, having spent 16 days in custody.

On December 2, 2016, the Attorney General filed a letter brief urging the mootness of A.T.'s petition, and, on December 13, A.T. filed a reply, in which she stated that she had filed a motion to withdraw her admission in the juvenile court on December 12. On December 23, we issued an order staying all further proceedings related to A.T.'s prosecution, including the scheduled hearing on her motion to withdraw her guilty plea, pending our resolution of this writ petition.

The record reveals beyond a doubt that the juvenile court detained A.T. for 15 days in order to pressure her to accept a plea bargain. It also shows that when it denied her request for release on November 3, 2016, the juvenile court gave improper weight to its own assessment of the suitability of A.T.'s mother's neighborhood.

## GOVERNING PRINCIPLES

It is the declared purpose of our Juvenile Court Law "to provide for the protection and safety of the public and each minor under the jurisdiction of the juvenile court and to preserve and strengthen the minor's family ties whenever possible, removing the minor from the custody of his or her parents only when necessary for his or her welfare or for the safety and protection of the public." (§ 202, subd. (a).)

To this end, section 635 directs that, after holding a detention hearing, "the court *shall* make its order releasing the minor from custody," "unless it appears . . . that it is a matter of immediate and urgent necessity for the protection of the minor or reasonably necessary for the protection of the person or property of another that he or she be detained or that the minor is likely to flee to avoid the jurisdiction of the court[.]" (§ 635, italics added.) "By requiring that the minor be released unless the case [falls] within one

6

of the specified categories, the Legislature indicated its intention that detention be the exception, not the rule." (*William M.*, *supra*, 3 Cal.3d at p. 26.)

"[T]he determination whether to detain a *minor* following a warrantless arrest for criminal activity is a complex one, requiring consideration of various factors personal to the minor and [her] family situation [citation], and the application of several important statutory presumptions favoring the minor's early release to a parent, guardian or responsible relative. . . ." (*Alfredo A. v. Superior Court* (1994) 6 Cal.4th 1212, 1222.)

"The basic predicate of the Juvenile Court Law is that each juvenile be treated as an individual." (*William M.*, *supra*, 3 Cal.3d at p. 31.) " '[T]he Juvenile Court Law protects the minor's right to an individualized detention hearing, in which the court may not dispose of cases by mechanical rules on a categorical basis.' " (*In re Bianca S.* (2015) 241 Cal.App.4th 1272, 1275, quoting *William M.*, at p. 19.)

"[S]ection 636 contains alternative grounds for detention. Hence, the juvenile court must at least specify the ground which the facts support. [Citation.] In the absence of such findings the reviewing court may well be faced with great difficulty in determining the factual basis for detention." (*William M.*, *supra*, 3 Cal.3d at p. 27, fn. 19.)

"The nature of the charged offense cannot in itself constitute the basis for detention. [Citations.]" (*William M.*, *supra*, 3 Cal.3d at p. 30.) Further, "[t]he juvenile court, of course, may not assume guilt if the minor denies responsibility for the alleged offense. [Citations.] Nor may the juvenile court condition the juvenile's release upon [her] waiver of [the] privilege against self-incrimination. [Citations.]" (*Id.* at p. 29, fn. 23; *People v. Superior Court* (*Felmann*) (1976) 59 Cal.App.3d 270, 276 [a court may not treat a defendant more harshly because she exercises her right to trial].) "[T]o punish a person for exercising a constitutional right is 'a due process violation of the most basic sort.' " (*In re Lewallen* (1979) 23 Cal.3d 274, 278, quoting *Bordenkircher v. Hayes* (1978) 434 U.S. 357, 363 [trial courts may not chill the exercise of the constitutional right to trial by jury].)

In adult criminal courts, our Supreme Court has observed, package-deal plea bargains pose a particular danger of coercing guilty pleas because "[e]xtraneous factors not related to the case . . . may be brought into play." (*In re Ibarra* (1983) 34 Cal.3d 277, 287 (*Ibarra*).) "Because such considerations do not bear any direct relation to whether the defendant himself is guilty, special scrutiny must be employed to ensure a voluntary plea." (*Id.* at p. 287.) For this reason, we are charged with examining " 'the totality of the circumstances whenever a plea is taken pursuant to a "package-deal" bargain.' " (*People v. Sandoval* (2006) 140 Cal.App.4th 111, 125, quoting *Ibarra*, at p. 288.) " ' "[T]he voluntariness of a plea bargain which contemplates special concessions to another—especially a sibling or a loved one—bears particular scrutiny by a trial or reviewing court conscious of the psychological pressures upon an accused such a situation creates." ' " (*Sandoval*, at p. 125, quoting *Ibarra*, at p. 289.)

## ANALYSIS

### 1. *A.T. Was Under Pressure To Plead Guilty*

Our Supreme Court has recognized that serious concerns arise when codefendants are presented with package-deal plea bargains. (See *Ibarra*, *supra*, 34 Cal.3d, 277.) We believe these concerns are greatly magnified when the codefendants are minors. Indeed, given "[t]he basic predicate of the Juvenile Court Law . . . that each juvenile be treated as an individual" (*William M.*, *supra*, 3 Cal.3d at p. 31), we question whether package-deal plea offers have any place at all in juvenile court.

In the case before us, reviewing the totality of the circumstances, we have little trouble concluding that A.T. was under pressure to plead guilty based on "considerations . . . bear[ing] no direct relation to whether" she was guilty in fact. (*Ibarra*, *supra*, 34 Cal.3d at p. 287.) From the day she was arrested, A.T. indicated that: She was innocent of the charges against her; she wanted to go to trial; and she expected her brother's truthful testimony, if permitted, would exonerate her. The prosecutor's insistence on a package plea deal, however, virtually guaranteed that A.T.'s defense would never come to light.

8

First, the record suggests that the offer was of benefit to her brother, but not to A.T. He wanted to accept the bargain. As the Supreme Court recognized in *Ibarra*, this circumstance in itself may place pressure on an innocent sibling to plead guilty. (*Ibarra*, *supra*, 34 Cal.3d at p. 289 [" '[t]he voluntariness of a plea bargain which contemplates special concessions to another—especially a sibling or a loved one—bears particular scrutiny by a trial or reviewing court' "].)

Even if she withstood the pressure to go along with her brother, A.T. would have had to refuse the deal in light of the court's order joining their cases. By declining the plea offer, A.T. could have forced her brother to go to trial, but she could not have forced him to take the stand at their joint trial and give the self-incriminating testimony most likely to exonerate her. In fact, the court's joinder order further weighted the scale in favor of A.T.'s pleading guilty by creating a risk that her brother would testify against her at trial. The package nature of the plea offer also ensured that her brother could not bargain for immunity in exchange for giving truthful testimony at A.T.'s trial.

Worse, as the November 3, 2016 hearing progressed, it became increasingly apparent that pleading guilty was the only way A.T.—who by then had spent 10 days in custody—had any chance of being released. Indeed, A.T.'s counsel informed the court that her client was tempted to plead guilty *only* because she perceived that doing so would allow her to go home. This perception was entirely justified. While asserting he did not want her "to admit to things that [she was] not voluntarily doing," the juvenile court judge appeared to do exactly that: On November 3, 2016, when A.T.'s counsel told him she was prepared to accept a plea bargain, he indicated he would grant the probation department discretion to release her to her mother on home supervision. But when he learned that A.T. no longer accepted the offer, the judge changed his mind, announcing he would not grant the probation department such discretion.

Similarly, on November 9, 2016, after A.T. had spent 15 days in custody, the juvenile court again denied her request to be released. It was only moments later, after she changed her mind and pleaded guilty, that the court changed its mind and authorized the probation department to release her. On this record, we are compelled to conclude

9

that A.T, a 14-year-old girl who had never been incarcerated or otherwise removed from her parents' custody, was being penalized for exercising her constitutional right to go to trial. Under these circumstances, her ultimate relinquishment of that right is less surprising than the fact she refused for more than two weeks.

### 2. *The Court Failed to Consider A.T.'s Case On Its Individual Merits*

As we have said, the court must make an individualized and evidence-based assessment of a juvenile defendant's fitness for release based upon the criteria set forth in Welfare and Institutions Code section 635. The court must also specify the facts supporting its determination, keeping in mind that, "the intendments [of the Juvenile Court Law] are all *against* detention, and it may not be ordered unless there is clear proof of the 'urgent necessity' which sections 635 and 636 require." (*In re Dennis H.* (1971) 19 Cal. App.3d 350, 354, fn. omitted, citing *William M.*, *supra*, 3 Cal.3d at pp. 25-31.)

The court justified detaining A.T. by pointing to the seriousness of the charges against her, but, as we have said, "[t]he nature of the charged offense cannot in itself constitute the basis for detention." (*William M.*, *supra*, 3 Cal.3d at p. 30.) The available evidence suggested A.T.'s involvement, if any, in stealing or carrying the gun was minimal. In fact, the prosecutor was willing to dismiss the three serious charges against her in return for her plea to a lone misdemeanor.

The court also relied on its personal view that A.T.'s mother lived in an unsafe neighborhood. While the Juvenile Court Law "provide[s] ample authority for the detention of children for their own protection" (*William M.*, *supra*, 3 Cal.3d at p. 26, fn. 17), the determination that a child needs this sort of protection must be fact-based. In pursuit of the needed facts, the court must "hear relevant evidence the minor [or] . . . her parent . . . desires to present." (§ 635.) Here, the court heard testimony from A.T.'s mother that her "building is quiet [and] [i]t's not a lot of drama in there." But instead of deferring to this uncontradicted evidence, the court detained A.T. based upon its own subjective and categorical opinions about downtown Vallejo. In doing so, the court denied A.T. the "elementary requirements of individualized justice and due process." (*William M.*, at p. 31.)

10

We note further that the court's stated rationales for detaining A.T. ring hollow in light of its willingness to send her home *after* she admitted the charges. A.T. was surely no less dangerous to the public, and her mother's neighborhood no safer, after she pleaded guilty than before.

## CONCLUSION

"The decision to take a minor away from [her] home, [her] parents, and [her] friends is fraught with . . . grave consequences. . . ." (*William M.*, *supra*, 3 Cal.3d at pp. 30-31, fn. omitted.) It is for this reason "[t]he Legislature has indicated that children should be released except under certain specific conditions of 'immediate and urgent necessity.' " (*Ibid.*) The record before us reveals no such necessity.

The court is directed to consider A.T.'s motion to withdraw the plea of guilty she entered on November 9, 2016, in light of the foregoing. This court's December 23, 2016 order temporarily staying proceedings in the juvenile court is vacated. To expedite proceedings in the juvenile court, this decision shall be final as to this court five days after its filing. (Cal. Rules of Court, rule 8.490(b)(2)(A).)

Trial Court:                          Solano County Superior Court

Trial Judge:                          Hon. D. Scott Daniels


Attorneys for Petitioner:             Solano County Alternate Public Defender
                                      Michiko K. Yamamoto

                                      Damian Carl Douglass Spieckerman
                                      Deputy Public Defender

Attorneys for Respondent:             Office of the Attorney General
                                      Kamala D. Harris
                                      Attorney General of California

                                      Joan Killeen
                                      Deputy Attorney General