Filed 2/20/24  In re A.G. CA2/5
Review denied 6/12/24; reposted with Supreme Court order and statement
**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| In re A.G., a Person Coming Under the Juvenile Court Law. | B321717 (Los Angeles County Super. Ct. No. MJ25062) |
| THE PEOPLE, Plaintiff and Respondent, v. A.G., Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Mario Barrera, Judge.  Affirmed.

Tonja R. Torres, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior

Assistant Attorney General, Steven D. Matthews and Ryan M. Smith, Deputy Attorneys General, for Plaintiff and Respondent.

_____

## I.    INTRODUCTION

A.G., a minor, pleaded no contest to second degree robbery. (Pen. Code, § 211.)  He appeals from the juvenile court's order declaring him a ward of the court and placing him home on probation, contending his plea resulted from coercion.  We affirm.

## II.    FACTUAL BACKGROUND[1]

On June 8, 2022, S.C. walked down Avenue J.  A.G. and two or three companions approached S.C. and asked, "'Do you bang?'" and stated, "'We don't like white boys.'"  S.C. said he did not belong to a gang and continued walking.

About 30 seconds later, S.C. heard footsteps approach him from behind.  He felt two hands shove him and he fell to the ground.  A.G. and his companions began punching and kicking S.C.  S.C. assumed a fetal position and attempted to cover as much of his body as he could.  S.C. was punched and kicked at least 30 times.

S.C. felt someone reach into his pants pocket.  A.G. and his companions stopped assaulting S.C. and walked away.  S.C.

_____

[1]    Because defendant pleaded no contest, we base our statement of facts on the Probation Officer's Report.

wanted to call 911, but noticed his cell phone had been taken from his back pants pocket.

A.G. and his companions returned to S.C. and demanded his passcode. S.C. gave them the wrong passcode. A.G. and his companions threatened to assault S.C. again if he did not give them the correct passcode. S.C. complied and A.G. and his companions left. S.C. lost three days of work and $408 in wages due to his injuries.

## III.    PROCEDURAL BACKGROUND

On June 10, 2022, the District Attorney of Los Angeles County filed a Welfare and Institutions Code section 602 petition charging A.G. with second degree robbery. The probation department's detention report recommended that A.G. remain detained, stating, "Release is not recommended. The minor is accused of committing a violent [Welfare and Institutions Code section] 707[, subdivision ](b) offense that involved force and fear. Elements related to the offense suggest the minor is a danger to the victim in that he along with other companions assaulted the victim, forcefully took the victim[']s cell phone from his pocket and fled the location. This level of delinquency requires immediate intervention and restriction[.]" At A.G.'s June 13, 2022, arraignment and detention hearing, the juvenile court denied defense counsel's request that A.G. be released from detention.

At a pretrial conference hearing on June 30, 2022, defense counsel again requested that A.G. be released from detention. Defense counsel stated she had two letters stating A.G. was of good character. Other evidence showed that S.C. was responsible

3

for the incident and threw the first punch, and A.G.'s role in the alleged robbery was minimal.

Defense counsel added there was a safety concern with A.G. remaining at juvenile hall. A.G. had been told that if he did not fight, "then basically he was going to get beat up . . . [he] was going to get picked on and possibly assaulted by the other kids . . . ." Defense counsel argued that "the probation officers allow the kids to fight," and "if we're removing [A.G.] from the community for his own safety, obviously we're putting him in a situation where his safety is at risk." Defense counsel explained that other clients had previously advised her that fighting took place in juvenile hall.

The juvenile court stated that defense counsel's characterization of A.G.'s role in the alleged robbery was based on disputed facts that were properly resolved in a trial. Moreover, it had considered many of the factors defense counsel raised when it earlier made its detention decision.

As for any threat A.G. faced at juvenile hall, the juvenile court suggested that A.G. and defense counsel "make probation aware of that." If A.G. was injured after making probation aware of the threats, he could file a civil action.

Defense counsel argued that she was not raising disputed facts, but facts in the police report and an 11-second video of a portion of the incident that showed A.G.'s role was minimal and that "it almost appears in the video like he's kind of trying to separate people or move them." Moreover, she had new evidence—the two letters, a pre-plea report, and a witness who reported that S.C. threw the first punch. The juvenile court stated that it could not consider the two letters and the witness

4

as new evidence. Defense counsel disagreed. The court offered to set the matter for a hearing on the next court date—July 7, 2022.

Defense counsel stated that setting a hearing would defeat the purpose of obtaining A.G.'s immediate release. She argued that "in terms of his safety in juvenile court, I believe the court can absolutely consider that. This court places minors under the care and custody of probation under the assumption that probation has to provide a safe environment. If the court is receiving information that probation is failing to do that . . . ." The court responded that it had not received such information. Defense counsel responded that A.G.'s parents could address the court on the issue.

The juvenile court stated, "[I]f we're going to have a hearing, we need to set it for a hearing. If you want to set it for a hearing, let me know and we will set it for a hearing." Defense counsel responded, "That's fine, Your Honor, we can set it for a hearing on the 7th."

After a brief recess, the juvenile court stated that defense counsel requested it recall the matter for a potential disposition. Defense counsel stated appellant was "willing to accept the court's indicated, which is upon admission he would be released and his case transferred to Kern County."

The juvenile court replied:

"Well, I don't think that that's correct, [defense counsel]. I have to clarify the record.

"The agreement is between the parties, which is the prosecution and defense, which is to allow [A.G.] to plead to one count, which is the only count, which is a 211.

"By law, since he lives in Kern County, this court indicated that it would transfer the matter to Kern County pursuant to—since he lives there—pursuant to the law.

"The court is not deeming or saying that it's going to release [A.G.] as a result of a plea or an admission, which is the way—it sort of sounded the way you were stating it, and that is incorrect.

"What I'm doing is I'm transferring the matter pursuant to the Welfare and Institutions Code. If he—and the People are actually arguing against the release of [A.G.] pending the transference to Kern County.

"This court has indicated that it is willing, based upon what it received as further information from the probation department, that if [A.G.] had been a resident of L.A. County, that they would have made a recommendation of home on probation. And so that tells me that their recommendation would be for him to be released after the plea.

"But this court, I want to be clear, is not stating that I want or desire or need him to plead and/or to admit in order for him to gain the release, which I think is inappropriate; that would be essentially coercing [A.G.] to enter the plea for the release.

"I'm indicating that I'm willing, potentially, because I have yet to still go along—well, actually it's not a disposition other than just the plea.

"So what I'm indicating is based upon the agreement of the parties which is an admission to the 211, I'm willing to allow that admission to go forth. And then based upon the request which is to send the matter to Kern County, I'm willing to do that since he lives in Kern County.

"If the defense then is asking for me to release him pending this transference, I'm willing to hear from both sides. But I've also given my tentative, which was to release him during the pendency of the case being transferred to Kern County."

Defense counsel then engaged the juvenile court in a discussion about the basis for its initial detention decision and the court's prior ruling that it was necessary to set a hearing to consider evidence about A.G.'s release from detention. After the court reviewed the pre-plea report with defense counsel's permission, the court continued the hearing to the following day.

At the start of the resumed hearing, A.G., represented by new counsel, requested that he be "released pending his case without entering an admission . . . so that he can fight his case while being at home." The juvenile court responded by reviewing the basis for its initial detention decision and the previous day's hearing. It then asked defense counsel whether he had any new information bearing on A.G.'s release.

Defense counsel again raised a concern about A.G.'s safety while at juvenile hall. He stated that after A.G.'s mother had successfully arranged to have A.G. moved within juvenile hall, A.G. had been threatened and "some comments potentially on social media" had labeled A.G. a "snitch[ ]." A.G. and his parents were concerned his life would be at risk if he remained in custody.

The juvenile court stated A.G.'s safety was of its "utmost concern." To address any safety issues, the court could "direct probation to keep [A.G.] housed separately for a period of time." It also could order probation to house A.G. at the Hope Center. It did not find, however, that the probation department was unable

to protect A.G.  Accordingly, the new information presented did not warrant A.G.'s release.

Defense counsel stated that A.G. was "prepared to admit the petition."  The juvenile court confirmed with defense counsel that A.G. had not, through defense counsel, been promised any conditions or release.

The juvenile court then took A.G.'s no contest plea to the charge of second degree robbery.  While taking the plea, A.G. stated that no one had made any promises to him to get him to admit to the petition, no one had made any threats to him or anyone close to him or his family in order to get him to admit to the petition, and he was admitting to the petition freely and voluntarily because he believed it was in his best interest.  The court found that A.G. "knowingly and intelligently waived his constitutional rights; that he understands the nature of the conduct and the possible consequences of the admission.  [¶]  The admission was freely and voluntarily made.  There's a factual basis for the no contest plea and the allegation in the petition, the court finds to be true."[2]

---

[2]  The dissent describes A.G. as "a boy who denied robbing anyone", who only entered a plea of no contest because he "had been regularly threatened" while in custody, and the court offered A.G. a way out of custody, that is, "if [A.G.] admitted the allegation, the court would free him."

We respectfully disagree with the dissent's characterization of the record.  As to A.G.'s denial of his participation in the robbery, A.G. admitted to the police to having been involved in a physical altercation with the victim and, following his arrest, he and one of the adults were recorded in the back of the patrol trying to "get their story straight."

8

The juvenile court next decided whether to transfer A.G.'s case to Kern County or keep it in Los Angeles County. The court found it was in A.G.'s best interest to keep the case in Los Angeles County.

The juvenile court then turned to disposition. Because the prosecution had not complied with Marsy's Law,[3] the court set the disposition hearing for July 12, 2022. The court released A.G., over the prosecution's objection, having received A.G.'s promise to return. The court explained that it was releasing A.G.

---

Moreover, as to the alleged "repeated threats" to A.G., during the June 30, 2022, hearing, A.G.'s counsel expressed concern over the general safety of minors in juvenile hall. Then, on July 1, 2022, new counsel explained his understanding that "implicit and direct threats have been made upon [A.G.]," but aside from a reference to a social media comment labeling A.G. a "snitch," which followed his transfer (at A.G.'s mother's request) to a different area in juvenile hall, counsel did not describe the nature of any such threats. More importantly, as explained above, the juvenile court expressed concern over counsel's reference to threats and offered to house A.G. separately or at a different facility.

Finally, the juvenile court, at the hearing on June 30, 2022, corrected A.G.'s counsel's description of the "potential disposition" as including a release upon his admission to the petition. And, during the continued hearing on July 1, 2022, when the court asked A.G.'s counsel, "And in regards to the admission of the petition, [A.G.] has not, through you, been promised any conditions or release at this time; is that correct?," counsel responded, "That is correct."

[3] The Victims' Bill of Rights Act of 2008. (Cal. Const., art. I, § 28.)

"because the recommendation is for me to place him home on probation." Further, the court did not want to "overly detain" A.G. because the prosecution potentially wanted to have S.C. speak at the disposition hearing pursuant to Marsy's Law.

At the July 12, 2022, disposition hearing, the juvenile court declared A.G. a ward of the court and placed him home on probation under various terms and conditions.

## IV. DISCUSSION

A.G. contends "[t]he totality of the circumstances surrounding his no contest plea to robbery demonstrate [his] plea was made under considerable pressure to escape threats of violence in juvenile hall, rather than having anything whatsoever to do with the merits of his underlying case." Thus, his plea was not knowing, intelligent, and voluntary. We disagree.

"Under both the state and federal Constitutions, a valid plea of guilty must be preceded by a knowing and voluntary waiver of [a] defendant's rights. '[T]he record must contain *on its face* direct evidence that the accused was aware, or made aware, of his right to confrontation, to a jury trial, and against self-incrimination, as well as the nature of the charge and the consequences of his plea.' [Citations.]" (*People v. Wrest* (1992) 3 Cal.4th 1088, 1102–1103; see *Boykin v. Alabama* (1969) 395 U.S. 238, 242–243 (*Boykin*); *In re Tahl* (1969) 1 Cal.3d 122, 132 (*Tahl*).)[4] "The record must affirmatively demonstrate that the

---

[4]     Minors have all the *Boykin–Tahl* rights except the right to a jury trial. (*In re Ronald E.* (1977) 19 Cal.3d 315, 321.)

plea was voluntary and intelligent under the totality of the circumstances. [Citations.]" (*People v. Howard* (1992) 1 Cal.4th 1132, 1178, fn. omitted.)

A defendant's waiver of his rights is knowing and intelligent if it is "made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it." (*People v. Collins* (2001) 26 Cal.4th 297, 305, internal quotation marks omitted.) It is voluntary if "it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." (*Ibid.*, internal quotation marks omitted.) We review de novo the voluntariness of a waiver. (*People v. Panizzon* (1996) 13 Cal.4th 68, 80.)

The record, on its face, shows that A.G.'s no contest plea was knowing and intelligent. In taking A.G.'s plea, the juvenile court advised A.G. of his constitutional rights and the consequences of his plea. A.G. stated he understood his rights and the consequences of his plea.

The record also shows A.G.'s plea was voluntary. The juvenile court confirmed with defense counsel that A.G. had not been promised release. It asked A.G. if anyone had made any promises to him in order to get him to admit to the petition or if anyone had made any threats to him or anyone close to him or his family in order to get him to admit to the petition. A.G. answered, "No, Your Honor" to each question. The court asked A.G. if he was admitting to the petition freely and voluntarily because he believed it was in his best interest. A.G. answered, "Yes, Your Honor." The court asked A.G. whether, after being advised of the consequences of his plea, he still wanted to enter a no contest plea. A.G. responded, "Yes, Your Honor."

11

As for A.G.'s contention that his concern about his safety while housed at juvenile hall coerced his no contest plea, the juvenile court stated it was very concerned about A.G.'s safety and could "direct probation to keep [A.G.] housed separately for a period of time" or order probation to house A.G. at the Hope Center. A.G. did not request either solution, and instead pressed for his immediate release. After A.G. pleaded no contest and was released from detention and thus no longer subject to threats at juvenile hall, he did not file a motion to withdraw his plea as having been coerced by the alleged threats.

*A.T. v. Superior Court* (2017) 10 Cal.App.5th 314, which A.G. cites in support of his appeal, is procedurally inapposite. In that case, the juvenile challenged the juvenile court's denial of her request to be released pending the disposition of criminal charges. (*Id.* at p. 317.) Although the juvenile had later pleaded guilty to the criminal charges, the court exercised its discretion to consider the merits of the petition because, among other things, the juvenile had filed a motion to withdraw her guilty plea. (*Id.* at p. 318.) Here, by contrast, A.G. neither filed a petition challenging the juvenile court's denial of his request for release nor made a motion to withdraw his plea. Instead, A.G. contends that contrary to his unequivocal statements during the change of plea hearing, his plea was coerced. We disagree.

12

# V.   DISPOSITION

The order is affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS


                                                KIM, J.


I concur:



    MOOR, J.

**RUBIN, P. J. — DISSENTING:**

I respectfully dissent.

The short version of the relevant facts is as follows: The juvenile court refused to release Albert G. upon his initial detention relying, at least in part, on a probation report that recommended against release, a report that included errors and inconsistencies. As various pretrial hearings were scheduled, and held or continued, Albert remained in custody for several weeks and was repeatedly threatened in juvenile hall. He consistently asked the juvenile court to release him pending resolution of the case. The Probation Department eventually agreed and recommended release. The juvenile court was not convinced, and just before Albert changed his plea, the court denied release once again. Moments later, Albert capitulated and pled no contest. Immediately thereafter, the court released Albert to his parents and ordered him to return for the final disposition hearing.

This summarized chronology of the key events is enough for me to conclude Albert's plea was coerced. But to present a fuller picture and fill in what I believe to be gaps in the majority opinion, I recite the facts in more detail throughout this dissent.

1. ***Legal Principles***

I start with the statutory purpose of juvenile delinquency law. In Division 2 ("Children"), Part 1 ("Delinquents and Wards of the Juvenile Court"), Chapter 2 ("Juvenile Court Law"), Section 202, the Legislature has enacted: "The purpose of this chapter is to provide for the protection and safety of the public and each minor under the jurisdiction of the juvenile court and to

preserve and strengthen the minor's family ties whenever possible, removing the minor from the custody of his or her parents only when necessary for his or her welfare or for the safety and protection of the public.  If removal of a minor is determined by the juvenile court to be necessary, reunification of the minor with his or her family shall be a primary objective.  This chapter shall be liberally construed to carry out these purposes."  (Welf. & Inst. Code, § 202, subd. (a); see, e.g., *In re Jose S.* (2017) 12 Cal.App.5th 1107, 1118, review denied ["Unlike the adult criminal justice system, which has a primary punitive purpose, reunification of a minor with his or her family and rehabilitation are the primary objectives of the juvenile system."].)[1]

At an initial detention hearing, the juvenile court determines whether to order the minor to remain in custody pending his jurisdictional hearing.  (§ 632, subd. (a).)

"To this end, section 635 directs that, after holding a detention hearing, 'the court *shall* make its order releasing the minor from custody,' 'unless it appears . . . that it is a matter of immediate and urgent necessity for the protection of the minor or reasonably necessary for the protection of the person or property of another that he or she be detained or that the minor is likely to flee to avoid the jurisdiction of the court.'  (§ 635, italics added.) 'By requiring that the minor be released unless the case [falls] within one of the specified categories, the Legislature [has] indicated its intention that detention be the exception, not the

---

[1]     Undesignated statutory references are to the Welfare & Institutions Code.

rule.' " (*A.T. v. Superior Court* (2017) 10 Cal.App.5th 314, 322 (*A.T.*).) The Legislature has thus spoken: Unless specific facts are found, "the court shall" make its order releasing the minor from custody. (§ 635; see *In re Bianca S.* (2015) 241 Cal.App.4th 1272, 1275 [under Juvenile Court Law, the intendments are all against detention, and it may not be ordered unless there is clear proof of urgent necessity].)

When making this determination, the court must treat every minor individually, "on a case-by-case basis." (§ 636, subd. (d); *A.T., supra*, 10 Cal.App.5th at p. 322.) Thus, although the court may consider the "circumstances and gravity of the alleged offense," it may *only* do so "in conjunction with other factors." (§ 635; *In re William M.* (1970) 3 Cal.3d 16, 30 (*William M.*) ["The nature of the charged offense cannot in itself constitute the basis for detention."].) If the court finds this test is satisfied, it may order the minor detained "for a period not to exceed 15 judicial days." (§ 636, subd. (a).)

At the detention hearing or any subsequent hearing, a minor facing a section 602 petition may admit the allegations against him and waive his jurisdictional hearing. (§ 657, subd. (b); *In re M.V.* (2014) 225 Cal.App.4th 1495, 1519.) Alternatively, he may enter a plea of no contest to the allegations. (Cal. Rules of Court, rule 5.778(e); *In re Alonzo J.* (2014) 58 Cal.4th 924, 937.) As with defendants in criminal cases, however, minors in delinquency matters are guaranteed the fundamental constitutional rights that accompany such an admission or plea—namely, that the waiver of those rights must be knowing, intelligent, and voluntary. (*People v. Collins* (2001) 26 Cal.4th 297, 308 (*Collins*); *Bradshaw v. Stumpf* (2005) 545 U.S. 175, 183.)

A waiver is intelligent if it is " ' " 'made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it . . . .' " ' " (*Collins, supra*, 26 Cal.4th at p. 305.) It is voluntary if it is " ' " 'the product of a free and deliberate choice rather than intimidation, coercion, or deception.' " ' " (*Ibid*.) "Coercion, either in the form of penalizing a defendant for exercising a constitutional right or promising leniency to a defendant for refraining from exercising a right, renders a waiver involuntary." (*People v. Dixon* (2007) 153 Cal.App.4th 985, 990.) We may not presume that a guilty plea is intelligent and voluntary; the record must affirmatively demonstrate that the defendant had the necessary knowledge and understanding. (*Boykin v. Alabama* (1969) 395 U.S. 238, 242.)

The voluntariness of a guilty or no contest plea is a question of law that is reviewed de novo. (*People v. Panizzon* (1996) 13 Cal.4th 68, 80.)[2]

---

[2] To the extent the majority concludes Albert has forfeited the issue because he did not move to withdraw his plea, I disagree. He was not required to do so under the facts of this case. "As a general matter, when a minor enters an admission as part of a negotiated plea agreement and does not later seek to withdraw that plea, the minor has forfeited the right to attack the terms of the bargain on appeal . . . . [Citations.] Application of this forfeiture rule, however, is not absolute. An appeal is permitted, for instance, on the issue of whether the waiver of rights made upon entering a plea was knowingly, voluntarily, and intelligently made." (*In re M.V., supra*, 225 Cal.App.4th at p. 1519.)

## 2.   *Proceedings Below*

With these principles in mind, I turn to Albert's detention history from the time of his arrest until the entry of his no contest plea.

### 2.1.   Detention Report of June 10, 2022 and Hearing of June 13, 2022

Albert was arrested and detained on June 8, 2022. A detention report was filed two days later, on June 10, 2022. The Los Angeles County Probation Department (Department) was unable to interview Albert because he was in quarantine for Covid-19, but based upon the seriousness of the charge, the Department recommended against his release.

At the detention hearing on June 13, 2022, defense counsel requested Albert's release pending adjudication.

The juvenile court expressed concern that despite the court's request, no one from the Department was available to explain various discrepancies in the detention report. In particular, the court wanted more information about why the Department had listed gang membership as a risk factor despite concluding Albert was not a gang member. The court also questioned the conclusion that Albert's parents lacked parental control despite the mother's statements that he was well-behaved at home and attending high school. The court explained, "I have to assume it cannot be just on the basis of this charge, otherwise that would always be checked, and that's not the case." The court also expressed concern about why the Department did not list lack of substance abuse as one of Albert's strengths, when the only information in the report was that Albert did not drink or use drugs.

Nevertheless, after asking for and receiving additional

information about the nature of the offense, the court ordered Albert detained. The juvenile court emphasized that it was "appreciative of the fact that this is a [section] 707(b) offense" and concluded that despite the inconsistencies in the detention report, based on the facts of the offense, "the court is going to go along with the recommendation of probation and detain the minor."[3] The court held the facts of the offense constituted prima facie evidence that Albert was a person described by section 602 and "the minor is to remain detained again, based upon the fact that it is of immediate and urgent necessity for the protection of the minor and for the protection and property of others." The court stated its understanding that because Albert's family lived outside Los Angeles County, it could not order Community Detention.

Before the hearing ended, Albert interjected that he was "not involved" in the incident. The court acknowledged Albert's disappointment at being detained and replied: "I can tell you that we are going to get a report on the next court date . . . .[4] *Just because you are being detained today does not mean that you*

---

[3] Albert was charged with second degree robbery, which is listed in section 707, subdivision (b). Although juvenile adjudications are usually not treated as criminal convictions, adjudications for crimes listed in section 707, subdivision (b), are different: If the minor goes on to commit a felony as an adult, the adjudication for an enumerated "707(b)" offense can be treated as a prior strike under the Three Strikes Law. (Pen. Code, § 667, subd. (d)(3)(D); *People v. Garcia* (1999) 21 Cal.4th 1, 6, 8.)

[4] The juvenile court appears to be referring to the pre-plea report that was in fact filed with the court on June 22, 2022.

*are going to continue to be detained on the next court date.* I don't know what's going to happen. *I am going to wait for that report.*" (Italics added.)

### 2.2. Pre-Plea Report—June 22, 2022

The pre-plea report was filed on June 22, 2022. In that report, the Department reversed its view on detention: It now advised the court *not* to remove Albert from his home pending adjudication of the petition. Specifically, on page 20, under the heading "Detention/Removal Findings," the report stated, "It is not deemed necessary to REMOVE the minor from the home at this time. Services reducing or eliminating the need for removal will be delivered. Case factors, including deterioration of behavior or the failure of intervention services to accomplish results may require removal from the home in the future." (All capital letters in original.)[5]

In addition to the facts stated in the earlier report, the pre-plea report included information from interviews with Albert and his parents. Albert had "no prior or subsequent record" of juvenile delinquency. And Albert and his parents all denied that he had any gang associations. Albert's parents reported having "a positive extended family." They explained that Albert had been depressed and anxious since the death of his great-grandmother the year before, and he was worried about his great-grandfather's currently poor health. But Albert typically

---

[5] By contrast, the original detention report, filed with the court on June 10, 2022, had checked "NO," after "A. RELEASE — IT IS RECOMMENTED THE MINOR BE RELEASED BASED ON THE FACTORS BELOW." (All capital letters in original.) Albert was not released at that hearing.

7

followed the rules at home, and thus, his behavior there was "pretty good." Albert's parents did not impose a curfew because he did not go out at night, although he did socialize with friends. To be sure, Albert's school attendance was poor, as were his grades. But he had strong interests in breeding and training dogs, as well as in mixed martial arts. He also worked for his uncle 35 hours per week.

### 2.3. The Court Again Denies Release—June 30, 2022

When the matter was called for pretrial conference on June 28, 2022, the court explained that the parties had discussed the case off the record. Because defense counsel wanted to speak with the deputy district attorney in charge "about a potential or possible reduction and/or resolution to the case," the matter was trailed for two days.

On June 30, 2022, the prosecutor represented that she had spoken to her head deputy, who rejected the defense "request to make it a non-strike offer" given the information available. Defense counsel indicated she wanted to speak with the head deputy herself, so the court continued the matter to July 7, 2022.

By this point, however, Albert had been in custody for more than three weeks. (See § 636, subd. (a) [court may detain minor before adjudication "for a period not to exceed 15 judicial days"].)[6] Thus, before the June 30th hearing concluded, defense counsel asked to be heard on release. Counsel presented two letters stating that Albert was a person of good character and was not a danger to the community. She also pointed to information in the

---

[6] At the initial detention hearing, Albert had waived statutory time to June 27, 2022, as day 0 of 15.

8

pre-plea report that had been filed the previous week: *"We do have a pre-plea report as well. Both parents indicate he has good behavior. I think the court is aware of that."* (Italics added.)[7] Albert had no behavioral problems in juvenile hall and had no prior offenses.

Counsel then turned to the facts of the case and the discovery of additional evidence that cast doubt on the severity of the offense as depicted at the previous hearing, particularly as to Albert's involvement. And, she stressed, Albert should be released for another fundamental reason—he had been threatened at juvenile hall. Other kids warned they would beat up Albert if he refused to fight them. Emphasizing that Albert had been detained for three weeks without behavioral issues, counsel argued "if we're removing Albert from the community for his own safety, obviously we're putting him in a situation where his safety is at risk." To allay any concerns the court might have about Albert's residence in Kern County, defense counsel also explained that Albert's father had arranged to stay with him in Burbank at Albert's grandfather's house. Thus, Albert would remain within Los Angeles County.

The juvenile court complimented Albert on his good behavior but declined to consider the "disputed facts" raised by defense counsel. As to the other new factors counsel had cited, the court explained: "The court, when it makes a decision to detain a person, which is what this court did back on the date of

---

[7]     Counsel's argument assumed the court had read the pre-plea report. It would later emerge that the court had not yet read the pre-plea report that recommended release.

9

June the 13th, 2022, it took into consideration most of the factors that you had already mentioned."

Defense counsel argued based on the facts in the pre-plea report—which was filed after the detention hearing—that Albert did not present a danger to the community, but the court responded, "this has already been dealt with." Counsel insisted she was presenting new information to support release: the letters of recommendation, the pre-plea report, and the new witness. But the court explained: "I can't consider if you have a letter from a victim or a witness as new information. I cannot consider that." Again, the court did not mention the pre-plea report.

Ultimately, Albert withdrew his waiver of statutory time, and a hearing was set for July 7, 2022.

### 2.4. The Case is Recalled—June 30, 2022

Later that same day, before Albert was physically returned to juvenile hall, the defense asked the court to recall the case so Albert could admit the allegation in the petition. She said Albert was "willing to accept the court's indicated, which is upon admission, he would be released and his case transferred to Kern County."

As the majority notes, the court disputed that characterization but stated "that it is willing, based upon what it received as further information from the probation department, that if the minor had been a resident of L.A. County, that they would have made a recommendation of home on probation. And so that tells me that *their recommendation would be for him to be released after the plea*." (Italics added.) The majority opinion does refer to the June 22, 2022 pre-plea report, but the opinion does not expressly state either (1) that in the pre-plea report, the

10

Department changed its earlier recommendation and now recommended Albert's release, or (2) that the juvenile court acknowledged during the hearing that it had not yet read that report.

In any event, the defense stated for the record that it was unnecessary for the juvenile court to set a subsequent hearing for the defense to argue for Albert's release. Rather, the defense posited the court could have, and should have, considered release at every hearing, "depending on the new information that comes to the court's attention." Counsel explained that her understanding of the prior proceedings was that, based on the seriousness of the offense, the juvenile court would not release Albert prior to an admission or plea. The court replied, "That's incorrect. That's not true."

The court explained it had detained Albert based on the warrant detention report and the information contained therein—information beyond the charged offense itself. The court asked why any clarification was necessary given that defense counsel had been present at the June 13, 2022 hearing, and repeatedly asked whether counsel was asking the court to reiterate its remarks from that hearing.

Counsel tried to explain that the detention hearing had occurred before the Department changed its recommendation from detention to home release, and stressed that the pre-plea report had addressed and resolved issues about which the court had seemed concerned at the initial hearing. The court could reconsider release from detention based on new information—the new information being the information the Department had gathered in the pre-plea report and its revised recommendation that Albert be released. Based on the Department's own

11

findings, counsel argued, there was no longer an "immediate and urgent necessity" for Albert's removal from home; the seriousness of the charge was the only remaining justification. (See § 635, subd. (a).) The court responded: "That's incorrect."

The discussion continued this way for some time, but eventually, the crux of the problem emerged: Defense counsel mistakenly assumed the court had read the pre-plea report. But the court said it had not read that report because defense counsel had not given the court permission to do so. With the confusion resolved, the parties took a break for the court to read the report, which it did.

By the time proceedings resumed, however, court hours had concluded for the day, and the matter had to be trailed to the following day. Albert wanted to admit the allegation that afternoon to secure his immediate release, but there was no time. The court assured those assembled that they would get to the bottom of things the next day.

### 2.5. The Court Denies Release for the Third Time and Albert Pleads No Contest—July 1, 2022

The next morning, a new alternate public defender appeared to represent Albert. He renewed Albert's request for release without entering an admission "so that he can fight this case while being at home." The court made a record of what had occurred on and off the record at the previous two hearings and denied the request. Again, the court did not acknowledge the pre-plea report or the Department's change in recommendation.

The court concluded: "What's been asked of the court today is whether or not the court is willing to allow the minor to be released, prior—as in before a plea is entered." When counsel confirmed that was Albert's request, the court asked: "Do you

have any new information that the court has—did not have before it yesterday with [prior defense counsel] reciting information?  Do you have any new information that the court could take into consideration after having previously yesterday denied this request from [defense counsel]?"

The new attorney again raised the fears Albert and his parents had for his physical safety at juvenile hall in light of "implicit and direct threats" of violence against him.  But the court again denied Albert's request for release, finding this information did not "merit[ ]" release on Community Detention pending the outcome of the case.  As an alternative, the court offered to "direct probation to keep the minor housed separately for a period of time" or order Albert placed in the Hope Center.  The court was unwilling to say it had "no faith in probation" to protect Albert.

At that point, defense counsel informed the court that Albert was "prepared to admit the petition."  During this hearing, no mention was made of either the pre-plea report or the Department's changed view on detention.

After the juvenile court elicited defense counsel's assurance that Albert had not been promised release, the court accepted Albert's no contest plea to the section 602 petition alleging robbery (Pen. Code, § 211), a strike offense.  During the plea colloquy, Albert agreed that he had not been promised anything in exchange for his plea and that neither he nor his family had been threatened to induce him to accept it.  The court found Albert "knowingly and intelligently waived his constitutional rights" and his "admission was freely and voluntarily made."

After Albert's plea, the parties argued about whether the case should be transferred to Kern County for disposition.  The

13

defense wanted the case to remain in Los Angeles; the prosecution argued for transfer. The court held it was in Albert's best interest for his case to remain in Los Angeles. The court started to turn immediately to disposition, but because the prosecution had not yet complied with the victim notification and statement procedures required by Marsy's Law, the disposition hearing was continued for 12 days to July 12, 2022.

After receiving Albert's personal assurance that he would appear at that hearing, the court ordered his release pending disposition: "The reason that I'm releasing him, just so the record is clear, is because the [Department's] recommendation is for me to place him home on probation." The court did not want to "overly detain" Albert simply because the prosecution wanted the complaining witness to speak at the disposition hearing in accordance with Marsy's Law.

The prosecutor objected to Albert's pre-disposition release: "The People do not believe there were any change of circumstances. If anything, he just admitted to the crime and the facts. And the court found them to be true based on the same set of facts that the court assumed to be true when the court determined the minor should have been detained. So there have been no changed circumstances. So the minor should not be released currently."

The court asked the prosecutor whether he was "suggesting that probation, when they made the recommendation of home on probation, is in error?" The prosecutor replied that he hadn't had a chance to question the probation officer about whether her recommendation was based on all the evidence, including an interview with the victim, but did not believe it was.

In response, the court expressed its confidence in the

14

Department's analysis: "I have no reason to doubt [the probation officer's] reputation. I know her very well since I've been in juvenile court. She appears to be, in my opinion, always intimately knowledgeable about the cases. [¶] I see no reason why she would not have taken all of that into consideration." Indeed, the court explained that the previous prosecutor had asked the probation officer whether the home on probation recommendation was "a result of some internal policy that would prevent her from seeking a more restrictive environment. And [the probation officer] said 'no' to that question. She said she was doing this based upon all of the information that she had. [¶] And this court has no reason to believe that she is not doing her job, as she normally does, nor that she is missing out on any information."

Albert was then released from custody pending disposition. As he had promised the court at the July 1, 2022 hearing, Albert appeared out of custody at the July 12, 2022 disposition hearing. Consistent with the Department's recommendation, the court declared Albert a ward of the court and placed him on home probation with terms and conditions.

### 3.     *Albert's Plea Was Involuntary*

Albert contends entering a no-contest plea was the only way to secure his release from juvenile hall, where, at the time of the plea, he had been confined for 24 days and had been regularly threatened; absent such a plea, the juvenile court was unwilling to consider new information that he did not present a danger to the community, *including* information presented by the Department in the pre-plea report. The People argue, and the majority agrees, that the plea colloquy demonstrates that Albert's plea was not coerced. Yet the People, the court below, and the

15

majority all fail to address the pre-plea report and its change in recommendation.

To emphasize, the juvenile court may only detain a minor if it finds "immediate and urgent necessity." (§ 635, subd. (a).) The probation department has the burden of making that showing. (*William M., supra*, 3 Cal.3d at p. 28.) The court in this case expressed concern about the Department's detention report, which was internally inconsistent,[8] and seems to have ignored the pre-plea report recommending release, although the court had read it. Despite its reservations about the first report, the court decided, based on the facts of the offense, to "go along with the recommendation of probation and detain the minor." (See *A.T., supra*, 10 Cal.App.5th at p. 324, citing *William M.*, at p. 30 [nature of the charged offense cannot, on its own, constitute the basis for detention].) In doing so, however, the court stressed to Albert that its ultimate detention decision would be based *not* on the detention report *but on the pre-plea report*, which would be filed before the next court date. That later report contained more information from a larger variety of sources and recommended release. Albert, the Department concluded, was not a danger to the community; he should be sent home to his parents. In light of the court's previous assurances, Albert undoubtedly expected the court to follow that advice. Yet the court continued to deny release, insisting repeatedly that nothing had changed. Under the circumstances, the court abused its discretion in not releasing

---

[8]     The detention report was prepared the day after Albert's arrest and based solely on a police arrest report and a conversation with Albert's mother.

Albert before the entry of a plea.[9] That abuse of discretion had the effect of coercing Albert's plea, thus rendering the plea unconstitutional.

Albert's responses during the plea colloquy were not magic words that negated this reality. After more than three weeks in custody, Albert, a boy who denied robbing anyone, who had never been in trouble with the law, and had never been removed from his parents, was denied release for a third time despite the

---

[9] I have found no reported case on the standard of review of an order denying (or granting) release before a jurisdictional hearing in a delinquency case. The issue would most likely arise in the context of a petition for extraordinary writ from the order itself, a different procedural posture from the present appeal. Because determining OR release for adult criminals is somewhat analogous, I consider the standard of review in that setting. Although the bail statutes have undergone significant changes over the years, historically, the abuse of discretion standard was applied to the review of a trial court decision whether to release on his or her own recognizance a person charged with a serious felony. (*In re Harris* (2021) 71 Cal.App.5th 1085, 1101–1102; see also *In re Khalid B.* (2015) 233 Cal.App.4th 1285, 1288 [in reviewing a delinquency commitment placement, the court stated, " 'We review a juvenile court's commitment decision for abuse of discretion, indulging all reasonable inferences to support its decision.' [Citation.] " '[D]iscretion is abused whenever the court exceeds the bounds of all reason, all of the circumstances being considered.' " [Citation.] We will not disturb the juvenile court's findings when there is substantial evidence to support them"].)

Although not fully developed into an argument, the Attorney General in Respondent's Brief states, "The court, in its proper discretion, found appellant was not eligible for release."

17

Department's recommendation that the court let him return home. Although the court had assured Albert it would revisit its decision when it received the pre-plea report, it ultimately did not do so. The court instead offered Albert a (tentative) way out: Despite the prosecution's vigorous opposition, if Albert admitted the allegation, the court would free him. In response, Albert agreed to admit a strike offense—receiving no concessions from the prosecution to induce him to do so. Moments later, after Albert entered the plea, the court in fact released him—based on its great confidence in the probation officer whose detention advice in the pre-plea report the court had ignored.

But as even the prosecutor noted, nothing had changed after the plea. The probation officer recommended release from detention both before and after Albert entered his plea. The court rejected that course of action before the plea; it changed course to accept the Department's recommendation only after Albert admitted a strike offense. The record does not reveal any basis for the court's choice. Under these circumstances, I cannot conclude that Albert's plea was "the product of a free and deliberate choice" such that he voluntarily relinquished his constitutional rights. (*Collins, supra*, 26 Cal.4th at p. 305.)

As the plea was constitutionally defective, I would reverse the judgment of the juvenile court and permit Albert to withdraw his plea.


RUBIN, P. J.

18

Court of Appeal, Second Appellate District, Division Five - No. B321717

**S284330**

# IN THE SUPREME COURT OF CALIFORNIA

**En Banc**

_____

In re A.G., a Person Coming Under the Juvenile Court Law.

_____

THE PEOPLE, Plaintiff and Respondent,

v.

A.G., Defendant and Appellant.

_____

The petition for review is denied.

Liu, Groban and Evans, JJ., are of the opinion the petition should be granted.


(See Dissenting Statement by Liu, J.)



_____/s/_____
*Chief Justice*

In re A.G.

S284330


Dissenting Statement by Justice Liu


For the reasons ably explained in Presiding Justice Rubin's dissent, the circumstances surrounding A.G.'s plea raise serious questions as to whether his plea was voluntary. I would grant review.

The Legislature has made clear that the primary objectives of the juvenile justice system are rehabilitation and family reunification. (Welf. & Inst. Code, § 202.) Detaining a minor in juvenile hall can compromise these objectives. Thus, a juvenile court "shall" order the release of a minor from custody unless the court finds specific facts warranting detention. (*Id.*, § 635, subd. (a).) A juvenile court may not ignore this clear directive and withhold releasing a minor from detention until the minor enters a guilty or no contest plea. When the juvenile court abuses its authority in such a manner, the voluntariness of the minor's plea is dubious.

When the juvenile court initially ordered A.G.'s detention, it relied on a deficient detention report from the probation department. The court assured A.G. that it would base its ultimate detention decision on the upcoming pre-plea report. In that pre-plea report, the department changed its position and recommended A.G.'s release. Contrary to its previous assurances, and despite the department's revised recommendation, the juvenile court refused to reconsider its detention order on two more occasions, including immediately

before A.G. entered his plea. At that point, A.G. had been confined for over three weeks.

At the hearings on June 30, 2022, and July 1, 2022, A.G.'s counsel stated their understanding that the court would release A.G. once he entered the plea. The court responded by disabusing counsel of the notion that the court was promising A.G.'s release upon entry of the no contest plea, and the court confirmed that counsel had not promised A.G. that he would be released upon entering a plea. When the pre-plea report was again brought to the court's attention on June 30, the court took a break to read the report. But when the hearing resumed on July 1, the court again denied release. At that point, A.G. entered his plea, and the court immediately ordered his release based on the pre-plea report. As the prosecutor observed, nothing had changed in the circumstances bearing on whether A.G. should be released; the court had become aware of the probation department's release recommendation *before* A.G. entered his plea. The only change was that A.G. had gone ahead and entered his plea; only at that point did the court grant his release.

Additional circumstances suggest that A.G.'s plea was not voluntary and was instead made to obtain release. A.G. received no benefit from the prosecutor for admitting the allegation of second degree robbery, a strike offense. The lack of a benefit to A.G. is particularly significant as the record indicates A.G. potentially had a strong defense, including facts in the police report and video evidence that his involvement was minimal. In addition, A.G. entered into the plea agreement after he had advised the court that he feared for his safety. Direct or indirect fear or threats are relevant considerations when assessing whether an individual's plea

was coerced. A.G. and his counsel repeatedly raised those fears with the court. During an earlier hearing, A.G.'s counsel stated probation officers allowed children to fight at juvenile hall, and there were indications A.G. was being pressured to do so. The juvenile court's offer to move A.G. to another facility or house him separately is beside the point. Indeed, A.G.'s mother had arranged for A.G. to be moved within juvenile hall, but A.G. continued to experience threats of violence.

(I note that A.G. was detained at Barry J. Nidorf Juvenile Hall, one of two Los Angeles juvenile hall facilities that has been found unsuitable for detaining minors. (Ellis, *L.A. County Has 2 Months to Fix Problems in Juvenile Hall — or Get Everyone Out. Again*, L.A. Times (Feb. 15, 2024).) Numerous Los Angeles probation officers were recently placed on leave based on allegations of doing exactly what A.G.'s counsel reported — allowing or encouraging detained children to assault one another — and a video of such an incident has been released. (Queally & Ellis, *Video Shows Staff Allowing Assault by Youths at Los Padrinos Juvenile Hall*, L.A. Times (Apr. 12, 2024); Queally, *Juvenile Hall Fight Videos Raise Question: Can L.A. County Probation Reports be Trusted?* L.A. Times (May 30, 2024); see also County of Los Angeles Probation, *LA County Probation Puts Four More Officers on Leave at Los Padrinos Juvenile Hall after Finding Additional Incidents of Youth-on-Youth Violence* (Apr. 26, 2024) <https://probation.lacounty.gov/lacountyprobationputsfourmor eofficersonleaveatlospadrinos/> [as of June 12, 2024].))

Further, A.G. was 17 years old, was in ninth grade, and had no prior contact with the juvenile justice system. According to the probation department's reports, his mother said he was well-behaved at home, he had no gang

associations, he had "a positive extended family," and his father had arranged for him to stay at his grandfather's house in Burbank upon release. It is a fair inference that A.G., realizing that the court was unwilling to release him despite these circumstances and the pre-plea report's recommendation, felt he had no option but to enter a no contest plea to obtain release.

The sequence of events in this case supports A.G.'s claim that after being detained for 24 days despite a pre-plea report recommending his release, he did not enter his plea voluntarily. Even after reading the report recommending A.G.'s release, the court inexplicably denied release until after A.G. entered his plea, even though nothing had changed. The upshot is that A.G. now has a strike offense, despite some evidence of his minimal involvement in the crime and no prior delinquency history. Because the trial court's refusal to release A.G. until he entered his plea raises serious questions as to whether the plea was voluntary, I would grant review.

**LIU, J.**

**We Concur:**

**GROBAN, J.**
**EVANS, J.**

°